Gary SHOWALTER

v.

**ALLISON REED GROUP, INC., d/b/a**
Techni–Craft Plating, Noel Smith
and Carol Marsella.

Nenh PHETOSOMPHONE

v.

**ALLISON REED GROUP, INC., d/b/a**
Techni–Craft Plating, Noel Smith
and Carol Marsella.

Civ. A. Nos. 90–0168L, 90–0182L.

United States District Court,
D. Rhode Island.

July 31, 1991.

Susan E. Deveney, Deveney & Casale, Cranston, R.I., for plaintiffs.

Shayle Robinson, Cranston, R.I., for Allison Reed Group.

Edward DiPippo, Providence, R.I., for Smith.

George L. Santopietro, Providence, R.I., for Marsella.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

These consolidated cases were instituted by plaintiffs Gary Showalter and Nenh Phetosomphone alleging that they were sexually harassed while employed at Techni–Craft Plating Company, a jewelry plating firm located in Cranston, Rhode Island. Essentially, they both claim that defendant Noel Smith, the General Manager of Techni–Craft, forced them to engage in various sexual activities with his secretary, defendant Carol Marsella, by threatening them with the loss of their jobs if they did not acquiesce in his demands.

Each complaint filed against Smith, Marsella, and Allison Reed Group, Inc., the corporate owner of Techni–Craft, contains two counts. The first count seeks equitable relief for sexual harassment under Title VII, 42 U.S.C. § 2000e *et seq.*, and the second count makes a claim for monetary damages under Rhode Island law for the tort of intentional infliction of emotional distress. These two cases were tried together with a jury. The Court directed a verdict for defendant Allison Reed Group on the second count of each complaint at the conclusion of plaintiffs' case. The defendants presented their evidence and the matter was submitted to the jury on each plaintiff's claim for intentional infliction of emotional distress against Smith and Marsella. The jury returned a verdict for each defendant on that claim. Later, the Court denied plaintiffs' motions for a new trial on the state law claims because the Court was satisfied that plaintiffs had failed to prove by a preponderance of the credible evidence all elements of such a cause of action.[1] The Court then took plaintiffs' request for equitable relief under Title VII against all three defendants under advisement.[2] The Title VII claims are now in order for decision.

## I. FACTS

Showalter was an employee at the Techni–Craft Plating Company from 1976 to 1979. He rejoined Techni–Craft in 1984 and worked there as a barrel plater[3] until sustaining a back injury in June of 1989. He has been receiving worker's compensation benefits since that time. Phetosomphone was employed at Techni–Craft from September 1987 until July of 1989.

Plaintiffs allege that a bevy of sexual incidents occurred on the Techni–Craft premises commencing during the summer of 1988 and lasting until their cessation of day to day work in June and July of 1989.

---

**1.** Proof of four elements is necessary to succeed on a claim of intentional infliction of emotional distress under Rhode Island law: "(1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe." *Champlin v. Washington Trust Co.,* 478 A.2d 985, 989 (R.I.1984). *See also Russell v. Salve Regina College,* 649 F.Supp. 391, 401 (D.R.I.1986) (providing a detailed analysis of the first two factors). The tort involves two proximate causation problems: the third element requires proof that the wrongful conduct proximately caused emotion-

al distress; the fourth element requires proof that the emotional distress proximately caused physical symptoms. *See Reilly v. United States,* 547 A.2d 894, 898–99 (R.I.1988). The Court firmly believes that both plaintiffs failed to prevail on the tort claim because neither proved that their claimed emotional distress produced physical symptomatology.

**2.** Title VII claims are triable without a jury. *See, e.g., Lehman v. Nakshian,* 453 U.S. 156, 164, 101 S.Ct. 2698, 2703, 69 L.Ed.2d 548 (1981).

**3.** A barrel plater plates racks of jewelry items with various metals using vats of chemicals.

Defendants Smith and Marsella deny that most incidents ever occurred. Allison Reed Group also denies that most incidents occurred and also contends that any such activity would clearly be outside the scope of its managing employee's job responsibilities.

The evidence establishes that an environment of sexual innuendo was prevalent at Techni–Craft during the time in question. Evidence of two particular incidents serves to prove the existence of such an environment. First, at the 1988 Christmas party, which was held on company premises, several employees exchanged gifts of a sexual nature. For example, Marsella gave two tee-shirts with sexually suggestive slogans. One shirt was introduced into evidence and marked as Plaintiff's Exhibit 7. It says "All I want is a little peace and quiet. Give me a little piece and I'll be quiet." A photograph of the second shirt was introduced into evidence and marked as Defendant's Exhibit K3. It says "Big cats are dangerous but a little pussy won't hurt anyone!" Another photograph, marked as Defendant's Exhibit H4 shows Marsella holding a present she received of black panties.

Second, the testimony of Daniel Salzillo, a retired letter carrier for the United States Postal Service, helps establish the existence of an environment charged with sexual innuendo at Techni–Craft. Salzillo testified that he was the regular carrier for Techni–Craft for seventeen years. He also testified that Marsella "flashed" him by showing him "everything she had" one day in the Spring of 1989. Showalter testified that Marsella flashed the mailman on a fifty dollar bet from Smith. Although Smith and Marsella denied the incident occurred, the Court believes that both Salzillo's and Showalter's testimony is more credible.

Showalter certainly did not refrain from interacting with his peers at Techni–Craft. One co-worker, Maurice Szarko, testified that he and Showalter, as a "joke," used to jockey for position in order to look down Marsella's blouse or up her skirt. Szarko testified that this happened numerous times, and was able to describe in detail the design pattern of Marsella's panties. The evidence also shows that Showalter participated in giving "gag" gifts of a sexual nature at the 1988 Christmas party. For example, Nicholas Ruzzano, another Techni–Craft employee, testified that Showalter gave him a package of condoms at the party. Defendant's Exhibit H2 is a photograph that shows Ruzzano holding up the condoms. In addition, several co-workers testified that Showalter bragged about his supposed sexual exploits with various women, and about his possession of x-rated videos. There is also credible evidence that Showalter made lewd proposals to a female co-worker on several occasions. In short, the evidence establishes that Showalter willingly contributed to the environment of sexual innuendo at Techni–Craft.

Phetosomphone, a Laotian immigrant, although hampered by a language barrier, also contributed to the sexual innuendo prevalent at Techni–Craft. Although not proficient in English, there is evidence that Phetosomphone mastered and regularly uttered several English vulgarities. Phetosomphone added some levity to the proceedings by testifying through an interpreter that the famous Shakespearean four letter colloquialism for sexual intercourse was also a Laotian word meaning "slicing the papaya."

Plaintiffs' claims of sexual harassment are not rooted in any of the above facts. Rather, a more egregious, less welcome series of activities by Smith and Marsella form the basis of their Title VII claims. These events stem from the relationship between Smith and Marsella and Smith's desire to have the plaintiffs participate in that relationship.

Smith and Marsella's relationship extended beyond that of boss and secretary. Clearly, they were having a sexual liaison. Both Smith and Marsella testified that they frequently went out to lunch together while at Techni–Craft. They also testified that they frequently went golfing together while employed there. After Smith resigned from Techni–Craft, both he and Marsella went to work together for another

company owned by a Smith relative. They were also both laid off from that company at the same time.

### A. *The Sexual Harassment of Showalter*

In the Spring of 1988, Smith began talking incessantly, and obsessively, about Marsella to Showalter. These talks were invariably of a sexual nature, and usually described Smith's sexual relationship with Marsella. Smith also shared with Showalter his various artistic expressions of his relationship with Marsella: nude photographs, pornographic drawings, and x-rated letters. Also, beginning in the Spring of 1988, Smith attempted to change Showalter's physical appearance in order to make him more pleasing to Marsella. Most notably, Smith told Showalter to begin wearing a long sleeve button down shirt to work instead of his customary tee-shirt. Smith explained the request as follows: "Carol Marsella wants to see you in a shirt." Showalter's initial refusal to change the type of shirt he wore to work caused Smith to repeat the demand.

By the end of the summer of 1988, Smith began directly prodding Showalter to join his sexual liaison with Marsella. Smith began telling Showalter that Marsella was interested in Showalter, and that he should join their sexual activity. Showalter declined on the grounds that he was married. Smith immediately stated that both he and Marsella were also married and that what their spouses didn't know wouldn't hurt them. Angrily, Smith told Showalter that Marsella controlled the hiring and firing decisions at Techni–Craft, and that if he valued his job he would follow Smith's demands. It is clear from the evidence that at this time Smith was attempting to install at the workplace a modified menage a trois.

Unfortunately for Smith, Showalter indeed proved to be more a man of words than of action. Thus, Smith was forced to make repeated threats to Showalter. For example, Smith reminded Showalter of his extensive connections in the jewelry business in Rhode Island implying that Showalter would be blackballed from the industry if he did not comply. Smith also told Showalter that he had to please Marsella in order for everything between Smith and Marsella "to be okay." At one point, Smith also threatened Showalter with the loss of his medical benefits if he failed to participate in the sexual activity. Smith knew that the medical benefits were especially important to Showalter because Showalter's eldest son had a heart defect and had undergone three open heart surgeries. Showalter had had discussions in the past with Smith apprising him of his son's condition.

Showalter first acceded to Smith's demands in September of 1988, when Smith orchestrated an after hours strip-tease performance by Marsella on company premises. Before the actual event, Smith gave explicit instructions to Showalter outlining the various sexual activity Smith expected Showalter to engage in with Marsella and him. Although Marsella failed to show up a couple of times as scheduled by Smith, she eventually did perform a strip-tease in front of Smith and Showalter. She also performed a second strip-tease about a month later.

Each time, Marsella stripped off all her clothes while dancing to music emanating from a portable tape recorder. When she finished undressing, Showalter followed Smith's earlier instructions and joined him in performing sexual acts with Marsella. Each time Showalter was unable to fully follow Smith's instructions because he could not attain an erection. The first time Marsella told Showalter that he was "out of luck," and left the area. The second time Smith asked Showalter what was wrong with him and even suggested that he take vitamins to remedy that situation.

Showalter was also forced to observe and engage in other sexual activity at Techni–Craft from September 1988 until June 1989. On a regular basis, when Showalter worked overtime and other employees had left, Smith required him to engage in sexual activity with Marsella. The sexual harassment was also present during the regular workday hours. Once Showalter

witnessed Marsella and Smith engaging in oral sex in Marsella's office as he walked by. Twice Showalter changed the outside storm windows at Marsella's office, once in the fall of 1988 and once in the spring of 1989. Both times, Smith and Marsella fondled each other and engaged in oral sex in full view of the window. Another time, Marsella grabbed him by his genitals; Showalter also witnessed Marsella do the same to Phetosomphone. Showalter also witnessed Phetosomphone fondle Marsella upon orders of Smith at a cribbage game of several employees during a break in the normal work day.

Showalter also was required to participate in a strip poker game on company premises following the 1988 Techni–Craft Christmas party. The game broke up when a driver from United Parcel Service unexpectedly opened up an unlocked door.

During the spring of 1989 Smith attempted to coerce Showalter to get Showalter's wife involved in Smith's broadening sexual net. Showalter resisted all of Smith's efforts, having to suddenly uninvite his wife to a jewelry convention to spare her from exposure to Smith's sexual circus.

### B. *The Sexual Harassment of Phetosomphone*

Smith also forced Nenh Phetosomphone to observe and participate in sexual activity at Techni–Craft. Phetosomphone assisted Showalter in twice changing Marsella's storm windows and saw the same sexual acts Showalter witnessed. Phetosomphone also participated briefly in the strip poker game after the 1988 Christmas party. In addition, as mentioned before, Marsella on one occasion grabbed his genital area.

The majority of the harassment of Phetosomphone concerns incidents that occurred during cribbage games and twice in Marsella's office. Beginning in January of 1989, Noel Smith told Phetosomphone to stand near Marsella at the daily card game played on the afternoon break and touch Marsella on her breasts and on her behind. Phetosomphone did this on several occasions.

Phetosomphone also engaged in sexual activity twice in Marsella's office on orders from Smith, while Smith viewed the activities from an adjoining room. Phetosomphone feared that he would lose his job if he refused to comply with the sexual demands made on him. He eventually left Techni–Craft on July 13, 1989 because of the sexual harassment.

## II. DISCUSSION

### A. *Sexual Harassment under Title VII*

■ Title VII of the Civil Rights Act of 1964 prohibits discrimination because of sex in employment situations. 42 U.S.C. § 2000e–2(a)(1). A claim of sexual harassment is a form of sex discrimination actionable under Title VII. *Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Two broad types of sexual harassment violate Title VII: quid pro quo sexual harassment and hostile work environment sexual harassment. *Id.* at 65, 106 S.Ct. at 2404. Because only "employers" can be held liable under either theory of sexual harassment, or for any Title VII violation, it is appropriate to analyze the status of the three defendants before discussing the law concerning the two types of sexual harassment.

### 1. "Employers" Under Title VII

■ Title VII defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b).

Defendant Allison Reed Group clearly is an "employer" for purposes of this case. So too is defendant Smith, who was Allison Reed's agent in charge at Techni–Craft. Smith performed the functions of a general manager at Techni–Craft and had the sole authority to hire and fire Techni–Craft workers. Defendant Marsella, however, is not an "employer" within the meaning of Title VII. Marsella was simply Smith's secretary, and merely a co-worker of the plaintiffs. She had no authority to make

any personnel decisions. *See Hamilton v. Rodgers,* 791 F.2d 439, 442 (5th Cir.1986). The plaintiffs' erroneous belief that Marsella could make such decisions can not overcome the reality that she, in fact, had no such power. A co-worker who is not the employer's agent with the power to supervise can not be held liable under Title VII. *Zabkowicz v. West Bend Co.,* 789 F.2d 540, 546 (7th Cir.1986).

### 2. Quid Pro Quo Sexual Harassment

Quid pro quo sexual harassment occurs when "a supervisor conditions the granting of an economic or other job benefit upon the receipt of sexual favors from a subordinate, or punishes that subordinate for refusing to comply." *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 897 (1st Cir.1988). A claim of quid pro quo sexual harassment must meet the five-part test set out by the First Circuit in *Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777 (1st Cir.1990). *Chamberlin* requires a plaintiff to show that "(1) the plaintiff-employee is a member of a protected group; (2) the sexual advances were unwelcome; (3) the harassment was sexually motivated; (4) the employee's reaction to the supervisor's advances affected a tangible aspect of [his] employment; and (5) *respondeat superior* liability has been established." *Chamberlin,* 915 F.2d at 783. An analysis of these factors shows that both plaintiffs have proved that they were subjected to quid pro quo sexual harassment.

First, both plaintiffs are members of a "protected group." Title VII protects both males and females from sexual harassment. *See Henson v. City of Dundee,* 682 F.2d 897, 903 (11th Cir.1982).

Second, both plaintiffs were subjected to unwelcome sexual advances. The essence of an inquiry into unwelcomeness is whether the sexual advances were "uninvited and offensive or unwanted from the standpoint of the employee." *Chamberlin,* 915 F.2d at 784. Although both plaintiffs contributed to the general tone of sexual innuendo at Techni–Craft, there is no evidence that either plaintiff invited or desired intimate physical sexual contact with Marsella. *See, e.g., Swentek v. USAIR, Inc.,* 830 F.2d 552, 557 (4th Cir.1987) ("Plaintiff's use of foul language or sexual innuendo in a consensual setting does not waive 'her legal protections against unwelcome harassment.'") (quoting *Katz v. Dole,* 709 F.2d 251, 254 n. 3 (4th Cir.1983)). Indeed, neither plaintiff welcomed sexual relations with Marsella. Both eventually participated only because they feared that noncompliance would cost them their jobs. Showalter expressly and verbally rejected Smith's invitation to join his sexual affair with Marsella. Showalter also manifested his displeasure with Smith's ideas by refusing to wear dress shirts when first told to do so. Certainly, if Showalter wanted to become sexually involved with Marsella he would have been eager to oblige her wardrobe preferences. The unwelcomeness of the sexual advances to Showalter is also evident by his utter repulsion by Smith's idea that Showalter's wife join the sexual activity. It is reasonable to think that Showalter would have at least entertained the thought if he had welcomed the sexual activity with Smith and Marsella.

Phetosomphone too did not welcome the intimate sexual activity at Techni–Craft. Although he did not verbally announce his position, he did leave the strip poker game after about five minutes. The cribbage games were held during breaks in the workday. The strip poker game happened after the company Christmas party during non-business hours. Phetosomphone clearly expressed his resistance to the sexual activities by deciding to leave.

An important factor in determining whether the plaintiffs welcomed the sexual advances is the availability and practical viability of an employer's grievance procedure. *Chamberlin,* 915 F.2d at 784. Allison Reed Group had no formal procedure in place for processing employee grievances. Its "Employee Handbook" introduced into evidence as Defendant's Exhibit A, states that employees should consult their supervisor or the Personnel Department if clarification of any Allison Reed Group employment policy is desired. The Handbook, however, does not set out *any* policy for processing of employment complaints. The

failure of the plaintiffs to register a complaint about the sexual advances does not at all indicate that the advances were welcome. Rather, the plaintiffs' failure to complain to someone at Allison Reed Group, which operates out of a separate facility in Warwick, is a reflection of Allison Reed Group's failure to have a policy or readily accessible personnel available to handle sexual harassment complaints.

In short, the clear weight of the evidence indicates that neither plaintiff welcomed the sexual advances of Smith and Marsella. Thus, both plaintiffs have satisfied the second *Chamberlin* factor.

Third, there is no question that the harassment of the plaintiffs was sexually motivated.

Fourth, the sexual harassment affected a "tangible" aspect of the plaintiffs' jobs. *Chamberlin* requires a plaintiff to prove that his reaction to sexual advances " 'affected tangible aspects of ... [his] compensation, terms, conditions, or privileges of employment....' " *Chamberlin*, 915 F.2d at 784 (quoting *Lipsett*, 864 F.2d at 898).

Here, the plaintiffs have shown that the harassment affected a tangible aspect of the conditions of their employment. Indeed, this is the quintessential quid pro quo case—the plaintiffs understood that they would lose their jobs if they did not submit to the sexual demands of Smith. In short, the harassment imposed a new condition on the plaintiff's employment: if they wanted to keep their jobs, they needed to comply with the condition of sexual harassment. The obvious tangible job benefit the plaintiffs received for succumbing to the harassment was the retention of their employment. *See Henson*, 682 F.2d at 909 ("The acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a tangible job benefit or the cause of a tangible job detriment in order to create [quid pro quo] liability....").

Fifth, not only is Smith directly liable under Title VII for his acts, but Allison Reed Group is also liable under the doctrine of *respondeat superior*. Employers are held strictly liable in cases of quid pro quo sexual harassment. *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir.1989). The Supreme Court in *Meritor Savings Bank* provided the rationale for this rule by citing to the following argument of the E.E.O.C.: "where a supervisor exercises the authority actually delegated to him by his employer, by making or *threatening to make decisions affecting the employment status* of his subordinates, such actions are properly imputed to the employer whose delegation of authority empowered the supervisor to undertake them." *Meritor Savs. Bank*, 477 U.S. at 70, 106 S.Ct. at 2407 (emphasis added).

In sum, each plaintiff has satisfied *Chamberlin*'s five requirements for making out a case of quid pro quo sexual harassment. The clear weight of the credible evidence indicates that the plaintiffs were forced to engage in intimate sexual contact as a condition of retaining their employment at Techni–Craft. Smith's bold-faced denials of the sexual incidents is unconvincing, and Allison Reed Group's legal argument that such conduct is outside the scope of his employment is meaningless in the face of strict liability.

### 3. Hostile Work Environment Sexual Harassment

■ The sexual harassment inflicted upon the plaintiffs also can be characterized as hostile environment sexual harassment. Unlike quid pro quo harassment which occurs when a supervisor promises an economic job benefit in exchange for sexual favors, hostile environment harassment occurs when "verbal or physical conduct of a sexual nature ... has the purpose or effect of ... creating an intimidating, hostile, or offensive work environment." E.E.O.C. Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.11(a).

Although all quid pro quo cases do not per se qualify as hostile environment cases, *Chamberlin*, 915 F.2d at 783, here the harassment drastically altered the conditions of plaintiffs' employment and created a hostile and abusive work environment. *Meritor Savs. Bank*, 477 U.S. at 67, 106 S.Ct. at 2405. *See also Henson*, 682 F.2d at 909 (listing the elements of a hostile

environment claim). The frequency and the nature of the unwelcome sexual activity certainly was severe and pervasive. *Meritor Savs. Bank*, 477 U.S. at 67, 106 S.Ct. at 2405. Sexual advances to the plaintiffs were made for months, and the harassment completely infested their work environment.

Smith is obviously liable for creating the hostile work environment. Whether Allison Reed Group could be held liable solely on the theory of hostile environment sexual harassment is an academic question. The Court has already determined that Allison Reed Group is strictly liable for the quid pro quo harassment of the plaintiffs. Whether it could be held liable solely on the basis of hostile environment sexual harassment would depend on principles of agency law, *id.* at 72, 106 S.Ct. at 2408, which need not be explored now.

## B. *Relief*

 Having concluded that the plaintiffs proved their claim of sexual harassment under Title VII, the next concern is awarding them appropriate relief. The relief afforded by a Title VII action is very clear. 42 U.S.C. § 2000e–5(g) states:

> If the court finds that the respondent has intentionally engaged in … an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay …, or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e–5(g). Compensatory and punitive damages clearly are not available to Title VII plaintiffs. *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 159 (1st Cir.1990). Nominal damages are considered to be an improper Title VII remedy by the Seventh Circuit. *Swanson v. Elmhurst Chrysler Plymouth, Inc.*, 882 F.2d 1235 (7th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 758, 107 L.Ed.2d 774 (1990). However, several other circuit

courts, including the First Circuit, have suggested that nominal damages can be awarded under Title VII. *T & S Serv. Assocs., Inc. v. Crenson*, 666 F.2d 722, 728 n. 8 (1st Cir.1981). *See e.g. Katz v. Dole*, 709 F.2d 251, 253 n. 1 (4th Cir.1983); *Henson*, 682 F.2d at 905–06 & n. 12; *Joshi v. Florida State Univ.*, 646 F.2d 981, 991 n. 33 (5th Cir. Unit B 1981).

### 1. Plaintiff Showalter

 In this case, Showalter was not forced out of his job by the harassment. Rather, a back injury has put him on worker's compensation. Clearly, Showalter is not entitled to backpay. There is, however, the likelihood that Showalter will recover from his back injury and find himself working again at Techni–Craft. Although Smith is no longer employed by Allison Reed Group, the company still suffers from the lack of a grievance procedure for harassed employees. Therefore, it is appropriate for the Court to enjoin Allison Reed Group from allowing the future sexual harassment of Showalter. *See, e.g., Ross v. Double Diamond, Inc.*, 672 F.Supp. 261, 277 (N.D.Tex.1987). Allison Reed Group is directed to the E.E.O.C.'s Guidelines on Sexual Harassment:

> Prevention is the best tool for the elimination of sexual harassment. An employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under Title VII, and developing methods to sensitize all concerned.

29 C.F.R. § 1604.11(f).

It is also the judgment of the Court that Allison Reed Group be required to designate an officer at its headquarters to receive and process sexual harassment complaints, and that this be set forth in the Employee Handbook. In this manner, employees at Techni–Craft will have a repository outside that firm for consideration of sexual harassment claims, to the end that this sorry episode at Allison Reed Group's

corporate subsidiary will never again be repeated.

Because Smith no longer is employed by Allison Reed Group, there is no need for the injunction to run against him. As against Smith, Showalter is only entitled to nominal damages in the amount of one dollar. *See Spencer v. General Elec. Co.,* 697 F.Supp. 204, 219 (E.D.Va.1988).

One of the great maxims of equity is that a Court of Equity will suffer no right to be without a remedy. *See Walters v. Marathon Oil Co.,* 642 F.2d 1098, 1100 (7th Cir.1981). If the Court did not award nominal damages to Showalter against Smith in this case, Showalter would have been wronged by Smith but would have no remedy. Nominal damages serves to tell the world that Showalter has been aggrieved by Smith's conduct although he cannot recover actual monetary damages in this particular case. In short, this Court believes that a nominal damage award is an appropriate equitable remedy in this kind of a situation.

### 2. Plaintiff Phetosomphone

 Phetosomphone left Techni–Craft in July of 1989 and found other employment eight weeks later. He does not seek reinstatement at Techni–Craft and there is no need for an injunction to issue in his case. However, Phetosomphone left Techni–Craft only because he could no longer tolerate being sexually harassed. Because he acted reasonably in leaving Techni–Craft, Phetosomphone's departure qualifies as a constructive discharge. Therefore, Phetosomphone is entitled to back pay for the period of time it took to acquire new employment.

Although Phetosomphone's counsel failed to introduce evidence of his wages and his period of unemployment, defense counsel for Allison Reed Group did elicit the information from Phetosomphone on cross examination. Phetosomphone testified that he was earning $7.80 per hour at Techni–Craft when he left on July 13, 1989, and that he was unemployed for two months. During his unemployment, Phetosomphone did not apply for unemployment compensation. He eventually found work at a starting wage of $6.50. In addition, the defendants introduced into evidence two paychecks of Phetosomphone. One is dated April 6, 1988 and is in the amount of $210.03. At that time, Phetosomphone was earning $7.25 an hour. The other check is dated July 12, 1989, the day before Phetosomphone left, and is in the amount of $217.20. This evidence is sufficient to allow the Court to make an award of back pay to Phetosomphone against defendants Allison Reed Group and Smith. The base amount of the award is $1737.60, which is the amount of Phetosomphone's July 12, 1989 paycheck multiplied by eight, the number of missed pay periods. In addition, the Court, in its discretion, believes that Phetosomphone is entitled to an award of prejudgment interest. *Loeffler v. Frank,* 486 U.S. 549, 557–58, 108 S.Ct. 1965, 1970–71, 100 L.Ed.2d 549 (1988). The choice of an appropriate interest rate is also "committed to the district judge's discretion." *Conway v. Electro Switch Corp.,* 825 F.2d 593, 602 (1st Cir.1987). In this case, an interest rate of eight percent is reasonable. *Id.* at 600. Prejudgment interest will be calculated on the award starting from September 7, 1989, the date Phetosomphone found new employment, to the date of judgment.

### III. CONCLUSION

Because defendant Marsella is not an "employer" under Title VII, she is entitled to judgment on plaintiffs' Title VII claims (the first count of each complaint). The Court finds that both plaintiffs were subjected to sexual harassment. The harassment can be characterized as both quid pro quo sexual harassment and hostile work environment sexual harassment. Showalter is entitled to nominal damages in the amount of $1.00 against defendant Smith. As against defendant Allison Reed Group, Showalter is entitled to an injunction barring the company from allowing any sexual harassment of him when, and if, he returns to work there. In addition, Allison Reed Group is mandatorily enjoined to designate an officer at its headquarters to receive and process sexual harassment complaints

and to state this information in its Employee Handbook. Phetosomphone is entitled to judgment in the amount of $1737.60, plus eight percent per annum interest calculated from September 15, 1989 to the date of judgment against both Allison Reed Group and Smith.

Judgment shall enter for all defendants on the second count of each complaint.

Because the plaintiffs have prevailed on some of the claims made in this case, they are entitled to some costs and an award of some counsel fees under 42 U.S.C. § 2000e–5(k). Any motion for such costs including counsel fees shall be made within thirty (30) days of this decision. The application for counsel fees must be supported by a detailed, contemporaneous accounting of the time spent by the attorneys on this case. *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984).

The Clerk will enter judgment forthwith on each Count of each Complaint as set forth above.

IT IS SO ORDERED.