**Sharon KARIBIAN, Plaintiff–Appellant,**

v.

**COLUMBIA UNIVERSITY, John Borden, Defendants–Cross–Claimants–Appellees,**

v.

**Mark URBAN, Defendant–Cross–Defendant–Appellee.**

**No. 513, Docket 93–7188.**

United States Court of Appeals, Second Circuit.

Argued Nov. 17, 1993.

Decided Jan. 25, 1994.

Elizabeth L. Koob, New York City (Joan Magoolaghan, Cara Cherry, Law Student, Koob & Magoolaghan, New York City, of counsel), for plaintiff-appellant.

Diane S. Wilner, New York City (Lee S. Gayer, Joel B. Rothman, Wilner & Associates, P.C., of counsel), for defendants-appellees Columbia University and John Borden.

Karen M. Moran, Washington, DC (James R. Neely, Jr., Deputy Gen. Counsel, Gwendo-

lyn Young Reams, Associate Gen. Counsel, Vincent J. Blackwood, Asst. Gen. Counsel, U.S. E.E.O.C. Office of General Counsel, of counsel), for the E.E.O.C. as amicus curiae.

Clifford M. Solomon, Corwin Solomon & Tanenbaum, P.C., New York City, for defendant-cross-defendant-appellee Mark Urban.

Isabelle Katz Pinzler, Sara L. Mandelbaum, Women's Rights Project, American Civil Liberties Union, Ellen J. Vargyas, Deborah L. Brake, National Women's Law Center, submitted an amici curiae brief, for the Women's Rights Project of the ACLU and the National Women's Law Center on behalf of plaintiff-appellant.

Before: MAHONEY, McLAUGHLIN and HEANEY,[*] Circuit Judges.

McLAUGHLIN, Circuit Judge:

Sharon Karibian appeals from a judgment entered in the United States District Court for the Southern District of New York (Thomas P. Griesa, Chief Judge) granting summary judgment to defendants Columbia University and John Borden, and dismissing Karibian's complaint of employment discrimination. Karibian's complaint alleged that sexual harassment committed by her supervisor, defendant Mark Urban, constituted discrimination by Columbia on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), and section 296 of New York's Executive Law. Karibian additionally alleged various state law tort claims against Columbia, Borden and Urban.

In the district court, Karibian proceeded under both available theories of sexual harassment: *quid pro quo,* and hostile work environment. In granting summary judgment to defendants, the district court held that Columbia could not be liable under a *quid pro quo* theory because Karibian failed to prove any actual economic loss resulting from Urban's harassment. On her hostile work environment theory, the court held that Columbia was not liable to Karibian because it did not have notice of Urban's harassment

and had provided a reasonable avenue for harassment complaints. *Karibian v. Columbia Univ.,* 812 F.Supp. 413 (S.D.N.Y.1993).

We conclude that the district court erred in requiring Karibian to demonstrate actual economic loss to prove *quid pro quo* sexual harassment. We also conclude that the court failed to apply the proper legal standard to determine an employer's liability for the hostile work environment created by a supervisor. Accordingly, we reverse and remand for further proceedings.

## BACKGROUND

In 1987, while a student in Columbia University's General Studies Program, Sharon Karibian worked in Columbia's fundraising "Telefund" office. Telefund was administered for Columbia by an independent contractor, Philanthropy Management Company ("PMI"), and was staffed by both PMI and Columbia employees. Karibian was an employee of Columbia. The Telefund office operated under the aegis of Columbia's "University Development and Alumni Relations" office ("UDAR").

In September 1987, Columbia appointed defendant Mark Urban as Development Officer for Annual Giving at UDAR. In that capacity, Urban had supervisory authority over Telefund, and, consequently, over Karibian. Specifically, Urban had the authority to alter Karibian's work schedule and assignments, and to give her promotions and raises (subject to approval). In addition, Urban had at least the apparent authority to fire Karibian.

This case involves Urban's alleged conduct towards Karibian while the two were employees of Columbia. Urban conceded that he and Karibian had a sexual relationship while he was her supervisor; however, the nature of that relationship—*i.e.,* whether consensual or coercive—remains hotly disputed. We limit our discussion to Karibian's version of events.

[*] Honorable Gerald W. Heaney, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

While working at UDAR, Urban "pursued" Karibian by repeatedly inviting her out to bars, ostensibly to discuss work-related matters. On those occasions, Urban often asked Karibian back to his apartment. Initially, Karibian rebuffed Urban's advances; ultimately, however, she yielded to pressure from Urban. Specifically, Karibian claimed that Urban coerced her into a violent sexual relationship by telling her that she "owed him" for all he was doing for her as her supervisor. Karibian also claimed that the conditions of her employment—including her raises, hours, autonomy and flexibility—varied from time to time, depending on her responsiveness to Urban. Karibian stated that she believed she would be fired if she did not give in to Urban's demands.

At first, Karibian told no one about her relationship with Urban. After some time, however, Karibian contacted two counselors at Columbia. In September 1988, Karibian contacted Columbia's Panel on Sexual Harassment, and met with Panel member Mary Murphy. Karibian told Murphy that she was afraid her boss would retaliate against her if she stopped sleeping with him. Shortly thereafter, Karibian met with Columbia's Equal Opportunity Coordinator, Ruth Curtis. At Karibian's request, both meetings were held confidential, and neither resulted in any investigation of Urban. According to Karibian, both Murphy and Curtis discouraged her from actively pursuing a complaint against Urban.

In April 1989, Karibian came to work upset and told her immediate Telefund supervisor, Loren Spivack, of a particularly violent sexual encounter with Urban. Spivack, a PMI employee, notified PMI's president, Ron Erdos. Neither Spivack nor Erdos informed anyone at Columbia about the incident.

Around July of 1989, Karibian applied for the position of Annual Giving Development Officer at Columbia. Columbia did not immediately consider Karibian for the position because Urban delayed forwarding her resume to the personnel department. Although Columbia eventually considered Karibian's application, she did not get the job. About the same time, Karibian applied for and received a promotion to the position of Project Director, the highest position within Telefund. As Project Director, Karibian reported directly to Urban at UDAR.

In January 1990, Karibian complained to Gertrude de la Osa, the Director of Development Services at UDAR, that she was afraid of being fired by Urban and that Urban was "sabotaging" her at Telefund. De la Osa brought Karibian's complaint to the attention of UDAR's Deputy Vice President, defendant John Borden. Around the same time, Karibian met again with Ruth Curtis; this time, Karibian dropped her request for confidentiality and gave Curtis permission to speak to others at Columbia about her troubles with Urban.

At this point, Columbia took steps to resolve the problem. Borden asked Urban to write a chronology of his relationship with Karibian, and removed him from direct supervisory authority over Karibian. (According to Urban's chronology, his relationship with Karibian was entirely consensual.) Without crediting either Karibian's or Urban's characterization of their relationship, Columbia forced Urban to resign—for reasons that remain somewhat vague. In August 1990, Columbia closed the Telefund office and Karibian was laid off.

Karibian then brought this suit against Columbia, Borden and Urban, claiming that Urban's sexual harassment violated Title VII. Following discovery, the district court granted defendants' motion for summary judgment.

The court began its analysis by recognizing that Title VII encompasses two theories of sexual harassment: *quid pro quo,* and hostile work environment. 812 F.Supp. at 416. Rejecting Karibian's *quid pro quo* claim, the court ruled that this theory requires proof of "actual—rather than threatened—economic loss because of gender or because a sexual advance was made and rejected." *Id.* Because Karibian had not suffered any economic detriment during her relationship with Urban—in fact, she had been promoted and had received pay raises during the relevant time—the court ruled that Karibian had no valid claim for *quid pro quo* harassment. *Id.*

The district court also rejected Karibian's hostile work environment theory. Relying on *Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59 (2d Cir.1992), the court held that Karibian "must prove 'that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" 812 F.Supp. at 416 (quoting *Kotcher,* 957 F.2d at 63). Applying this standard, the court ruled that (1) Columbia provided a reasonable avenue for making complaints, and (2) once Columbia got actual notice of Urban's misconduct in 1990, it promptly took adequate curative measures. On the latter point, the court rejected Karibian's argument that her confidential disclosures to Murphy and Curtis were sufficient to put Columbia on notice of Urban's harassment. The court also rejected Karibian's alternative argument that notice to her supervisors at PMI, an independent contractor, constituted notice to Columbia. Having disposed of Karibian's federal claim, the court went on to dismiss Karibian's pendent state law claims for lack of jurisdiction.

Karibian now appeals.[1]

### DISCUSSION

■ By its terms, Title VII prohibits discrimination on the basis of sex with respect to the "compensation, terms, conditions, or privileges" of employment. 42 U.S.C. § 2000e–2(a)(1) (1988). Although neither the statute nor its legislative history fleshes out the meaning of this sweeping prohibition, it is now established law that sexual harassment in the workplace violates "Title VII's broad rule of workplace equality." *Harris v. Forklift Sys., Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). While the law of sexual harassment continues to develop at a brisk pace, a plaintiff seeking relief for sexual harassment may presently proceed under two theories: (1) *quid pro quo,* and (2) hostile work environment. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986); *Kotcher,* 957 F.2d at 62. Karibian believes that Urban's harassment fits both paradigms; and we address each in turn.

### I. *Karibian's Quid Pro Quo Claim*

■ Under the Guidelines established by the Equal Employment Opportunity Commission ("EEOC"), *quid pro quo* harassment occurs when "submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual." 29 C.F.R. § 1604.11(a)(2) (1993). *See also Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 577 (2d Cir.1989). Accordingly, to establish a *prima facie* case of *quid pro quo* harassment, a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment. *See Lipsett v. University of Puerto Rico,* 864 F.2d 881, 898 (1st Cir.1988); *Highlander v. K.F.C. Nat'l Mgmt. Co.,* 805 F.2d 644, 648 (6th Cir.1986); *Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982).

■ Because the *quid pro quo* harasser, by definition, wields the employer's authority to alter the terms and conditions of employment—either actually or apparently—the law imposes strict liability on the employer for *quid pro quo* harassment. *See Kotcher,* 957 F.2d at 62 ("The supervisor is deemed to act on behalf of the employer when making decisions that affect the economic status of the

---

**1.** In the district court, Karibian also alleged that Columbia closed the Telefund office in retaliation for Karibian's sexual harassment complaint. *See* 812 F.Supp. at 417. In her main brief on appeal, Karibian does not argue the point separately. Rather, Karibian simply characterizes the "premature" closing of the Telefund office as "retaliatory" in the context of her argument that Columbia's complaint procedures were inadequate.

We have no obligation to review issues that are raised, but not independently and sufficiently developed, in an appellant's main brief. *See Freeman United Coal Mining Co. v. OWCP,* 957 F.2d 302, 305 (7th Cir.1992). We conclude that for purposes of appeal, Karibian has forfeited—if not abandoned—any independent claim she may have had for retaliatory discharge by subsuming that argument within her hostile work environment argument. *See, e.g., Brown v. Trustees of Boston Univ.,* 891 F.2d 337, 362 (1st Cir.1989).

employee."); *Carrero,* 890 F.2d at 579 ("[T]he harassing employee acts as and for the company, holding out the employer's benefits as an inducement to the employee for sexual favors.").

Karibian argues that the district court erred when it required her to present evidence of actual, rather than threatened, economic loss in order to state a valid claim of *quid pro quo* sexual harassment. We agree. There is nothing in the language of Title VII or the EEOC Guidelines to support such a requirement. *See Meritor,* 477 U.S. at 64, 106 S.Ct. at 2404 ("[T]he language of Title VII is not limited to 'economic' or 'tangible' discrimination.").

True, in the typical *quid pro quo* case, the employee who refuses to submit to her supervisor's advances can expect to suffer some job-related reprisal. *See, e.g., Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 142 (2d Cir.1993). Accordingly, in such "refusal" cases, evidence of some job-related penalty will often be available to prove *quid pro quo* harassment. But that is not to say that such evidence is always essential to the claim. In the nature of things, evidence of economic *harm* will not be available to support the claim of the employee who *submits* to the supervisor's demands. *Lipsett,* 864 F.2d at 913; *see, e.g., Showalter v. Allison Reed Group, Inc.,* 767 F.Supp. 1205, 1212 (D.R.I. 1991). The supervisor's conduct is equally unlawful under Title VII whether the employee submits or not. Under the district court's rationale, only the employee who successfully resisted the threat of sexual blackmail could state a *quid pro quo* claim. We do not read Title VII to punish the victims of sexual harassment who surrender to unwelcome sexual encounters. Such a rule would only encourage harassers to increase their persistence.

The relevant inquiry in a *quid pro quo* case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances. It is enough to show that the supervisor used the employee's acceptance or rejection of his advances as the basis for a decision affecting the compensation, terms, conditions or privileges of the employee's job. *See, e.g., Showalter,* 767

F.Supp. at 1212 ("The obvious tangible job benefit the plaintiffs received for succumbing to the harassment was the retention of their employment."). In this case, Karibian stated that her work assignments, raises and promotions depended on her continued responsiveness to Urban's sexual demands. In addition, Karibian claimed that Urban implicitly threatened to fire her and to damage her career if she did not comply. If true, Urban's conduct would constitute *quid pro quo* harassment because he made and threatened to make decisions affecting the terms and conditions of Karibian's employment based upon her submission to his sexual advances.

In support of an "actual economic loss" requirement, Columbia relies on isolated language from the *Kotcher* and *Carrero* cases, *supra,* decided by this Court. In *Kotcher,* we broadly stated that under a *quid pro quo* theory "the plaintiff-employee must establish that she was *denied an economic benefit* either because of gender or because a sexual advance was made by a supervisor and rejected by her." 957 F.2d at 62 (emphasis added). *Kotcher,* however, was a hostile work environment case, not a *quid pro quo* case; hence, the quoted language is, at best, dictum.

*Carrero* was a *quid pro quo* case, and there we did say: "The gravamen of a quid pro quo claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that *adverse consequences* follow from the employee's refusal." 890 F.2d at 579 (emphasis added). *Carrero,* however, was a "refusal" case, not a "submission" case; accordingly, as one might expect, the job-related consequences of Carrero's refusal were both obvious and "adverse." Consistent with the *prima facie* case outlined above, Carrero satisfied Title VII because her supervisor made decisions affecting her employment based on her response to his sexual advances. We read *Carrero*'s reference to "adverse consequences," therefore, as descriptive of the facts before the Court, not as establishing a *sine qua non* that employment decisions be "adverse" in order to state a valid claim. Accordingly, there is no inconsistency be-

tween *Carrero* and our conclusion that once an employer conditions any terms of employment upon the employee's submitting to unwelcome sexual advances, a *quid pro quo* claim is made out, regardless of whether the employee (a) rejects the advances and suffers the consequences, or (b) submits to the advances in order to avoid those consequences.

■ Finally, we believe imposing an "actual economic loss" requirement in a *quid pro quo* case where the employee submits to the unwelcome sexual overtures of her supervisor places undue emphasis on the victim's response to the sexual harassment. The focus should be on the prohibited conduct, not the victim's reaction. While the employee's submission to the supervisor's advances is certainly relevant, it bears only on the issue whether the sexual advances were unwelcome, not whether unwelcome sexual advances were unlawful. *See Meritor,* 477 U.S. at 68, 106 S.Ct. at 2406 ("The correct inquiry is whether respondent by her conduct indicated that the alleged sexual advances were unwelcome...."). Ultimately, the question whether Karibian submitted to Urban's advances out of a reasonable fear of some job-related reprisal is properly one for the finder of fact. Because the district court erroneously removed this central question from the factfinder by the grant of summary judgment, we reverse.

## II. *Columbia's Liability for Hostile Work Environment*

Karibian also contends that the district court erred when it held that Columbia could be liable under a hostile work environment theory only if she satisfied the standard applied in *Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59 (2d Cir.1992). In *Kotcher,* we said that the plaintiff must prove that the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." 957 F.2d at 63. Karibian contends that this standard is not applicable to all claims of hostile work environment, and that a different standard obtains here. Columbia responds that the standard described in *Kotcher* governs an employer's liability in this and

every hostile work environment case. Again, Karibian has the better argument.

■ A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Harris,* —— U.S. at ——, 114 S.Ct. at 370 (quoting *Meritor,* 477 U.S. at 65, 67, 106 S.Ct. at 2404, 2405). Whereas liability for *quid pro quo* harassment is always imputed to the employer, a plaintiff seeking to establish harassment under a hostile environment theory must demonstrate some specific basis to hold the employer liable for the misconduct of its employees. *Kotcher,* 957 F.2d at 62. Unfortunately, the "specific basis" of employer liability for a hostile work environment remains elusive.

In *Meritor,* the Supreme Court declined to announce a definitive rule on employer liability in hostile work environment cases. *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408. *Meritor* did, however, make two things clear: employers are not always liable for the hostile work environment created by their employees. *Id.* And, lack of notice and the existence of complaint procedures do not automatically insulate an employer from liability. *Id.* Beyond these alpha and omega rules, the Court declined to offer further enlightenment. Instead, we are instructed to be guided by common law principles of agency. *Id.*

■ A rule of employer liability deriving from traditional agency principles cannot be reduced to a universal, pat formula. It will certainly be relevant to the analysis, for example, that the alleged harasser is the plaintiff's supervisor rather than her co-worker. *See, e.g., Kauffman v. Allied Signal, Inc., Autolite Div.,* 970 F.2d 178, 183 (6th Cir.) (contrasting standard of employer liability in cases of co-worker harassment from that applicable in cases of supervisor harassment), *cert. denied,* —— U.S. ——, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992); *Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.,* 755 F.2d 599, 604 (7th Cir.1985) (suggesting that a notice requirement may be necessary in cases of co-worker harassment, but not in cases of harassment by supervisors). Yet, even such a distinction will not always be

dispositive. For example, we held in *Kotcher*, that the employer was not liable for the hostile work environment caused by the plaintiff's supervisor absent notice or the failure to provide a reasonable avenue for complaint. 957 F.2d at 63. We went on to caution, however, that we were not dealing in absolutes and that the *Kotcher* rule would not necessarily apply in all cases; we noted, for example, that "[a]t some point ... the actions of a supervisor at a sufficiently high level in the hierarchy would necessarily be imputed to the company." *Id.* at 64.

We have not yet had occasion to address the proper standard of employer liability where, as here, the plaintiff's supervisor created a discriminatorily abusive work environment through the use of his delegated authority. Common law principles of agency suggest that in such circumstances the employer's liability is absolute.

The Restatement of Agency notes that an employer will be liable for the torts of its employees committed "while acting in the scope of their employment," or, if not acting in the scope of employment, if the employee "purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." *Restatement (Second) of Agency* §§ 219(1) & (2)(d) (1958). Hence, when a supervisor makes employment decisions based on an employee's response to his sexual overtures, it is fair to hold the employer responsible because "the supervisor is acting within at least the apparent scope of the authority entrusted to him by the employer." *Henson*, 682 F.2d at 910.

■ We hold that an employer is liable for the discriminatorily abusive work environment created by a supervisor if the supervisor uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship. *See Restatement (Second) of Agency* § 219; 29 C.F.R. § 1604.11(c); *see also Hirschfeld v. New Mexico Corrections Dep't*, 916 F.2d 572, 579 (10th Cir.1990); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1559–60 (11th Cir.1987); *Watts v. New York City Police*

*Dep't*, 724 F.Supp. 99, 106 n. 6 (S.D.N.Y. 1989). In contrast, where a low-level supervisor does not rely on his supervisory authority to carry out the harassment, the situation will generally be indistinguishable from cases in which the harassment is perpetrated by the plaintiff's co-workers; consequently, the *Kotcher* standard of employer liability will generally apply, and the employer will not be liable unless "the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Kotcher*, 957 F.2d at 63. *See* 29 C.F.R. § 1604.11(d); *see also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987); *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.1986). *Cf. Hirschfeld*, 916 F.2d at 579 (employer not liable absent evidence that supervisor "ever invoked [his] authority in order to facilitate his harassment of plaintiff").

■ Applying these principles, we agree with Karibian that Columbia would be liable for Urban's alleged harassment regardless of the absence of notice or the reasonableness of Columbia's complaint procedures. The essence of Karibian's hostile work environment claim is that her supervisor capitalized upon his authority over her employment to force her to endure a prolonged, violent and demeaning sexual relationship. If the factfinder accepts Karibian's allegations, Columbia is liable to Karibian because Urban abused his delegated authority to create a discriminatorily abusive work environment.

Our conclusion that Columbia would be liable on a hostile environment claim for the harassment alleged by Karibian follows naturally from our earlier conclusion that Karibian stated a valid claim for *quid pro quo* harassment. Under the latter, courts have universally held employers liable for the actions of the supervisor because "[t]he supervisor is deemed to act on behalf of the employer when making decisions that affect the economic status of the employee. From the perspective of the employee, the supervisor and the employer merge into a single entity." *Kotcher*, 957 F.2d at 62. *See also Carrero*, 890 F.2d at 579 ("in *quid pro quo* cases the harassing employee acts as and for the company, holding out the employer's benefits as

an inducement to the employee for sexual favors"); *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989) ("When a supervisor requires sexual favors as *quid pro quo* for job benefits, the supervisor, by definition, acts as the company."); *Henson,* 682 F.2d at 910 (in a *quid pro quo* case, "the supervisor uses the means furnished to him by the employer to accomplish the prohibited purpose"). It would be a jarring anomaly to hold that conduct which always renders an employer liable under a *quid pro quo* theory does not result in liability to the employer when that same conduct becomes so severe and pervasive as to create a discriminatorily abusive work environment.

Columbia argues that holding it liable for Urban's harassment is contrary to the standard of employer liability we applied in *Kotcher.* We disagree. In *Kotcher,* the gist of the plaintiff's hostile work environment claim was that her supervisor subjected her to repeated vulgar comments and gestures. 957 F.2d at 61. We held that the employer would not be liable for the supervisor's misconduct unless the employer provided no reasonable avenue for complaint, or unless it knew of the supervisor's misconduct but did nothing about it. 957 F.2d at 63. As support for this standard of liability, we relied on *Snell v. Suffolk County,* 782 F.2d 1094, 1104 (2d Cir.1986), in which the harassment was perpetrated by the plaintiff's co-workers. In both *Kotcher* and *Snell* we simply applied the law of agency to the facts before us and concluded that liability for the misconduct alleged could not be imputed to the employer. In neither *Kotcher* nor *Snell,* however, did the harasser use his actual or apparent authority to further the harassment alleged. Thus understood, our holding today is complementary to *Kotcher,* not inconsistent with it.

## CONCLUSION

The judgment of the district court granting summary judgment on Karibian's Title VII claim is reversed and the matter is remanded for further proceedings consistent with this opinion. Because we reinstate Karibian's federal claim, the judgment dismissing Karibian's pendent state law claims for lack of jurisdiction is reversed as well. Finally, Columbia's request for an order directing Karibian to share the cost of the supplemental appendix is denied.

REVERSED and REMANDED.