Mary Kathleen **FERNOT**, Plaintiff,

v.

**CRAFTS INN, INC., A Corporation, et al., Defendants.**

No. 91–CV–29.

United States District Court, D. Vermont.

Aug. 2, 1995.

---

---

Katherine A. Hayes, and David F. Silver, Barr, Sternberg & Moss, P.C., Bennington, VT, for plaintiff.

John Downes Burke, Castleton, VT, for Crafts Inn, Inc., and Alice Richter.

John Eric Anderson, Anderson & Hartwell, Manchester, VT, for Crafts Inn Owners Association.

R. Joseph O'Rourke, and Martha Marguerite Smyrski, Ryan, Smith & Carbine, Ltd., Rutland, VT, for Coin Devices Corporation, Inc., Coin Depot Corporation, and Herman J. Koehler, III.

Caesar Passannante, Brewster, NY, pro se.

*OPINION AND ORDER*

GAGLIARDI, Senior District Judge.

## I. Introduction

Defendants have moved for judgment as a matter of law or in the alternative for a new trial or remittitur. For the reasons discussed below, the motion for judgment as a matter of law is granted in part and denied in part, and the motion for a new trial or remittitur is denied. The decision on the federal claims is also set out below.

## II. Claims

This case involves multiple claims against multiple defendants which arose from the employment of plaintiff, Mary Kathleen Fernot ("Fernot"), in connection with a time-share resort called the Crafts Inn ("the Inn") in Wilmington, Vermont, in 1989. Fernot asserted state and federal claims of sex discrimination through hostile environment and *quid pro quo* sexual harassment and retaliation for complaints thereof under Vermont's Fair Employment Practices Act ("FEPA"), 21 V.S.A. §§ 495–496 (1987 and Supp.1994), and Title VII, 42 U.S.C. § 2000e *et seq.* (1994) ("Title VII"), a state common law claim of intentional infliction of emotional distress ("IIED") and a final claim under the federal Equal Pay Act, 29 U.S.C. § 206(d) (1978).[1]

## III. Trial

### A. Procedure

All of the state law claims were tried to a jury. The sex discrimination claims proceeded against Crafts Inn Inc. ("CII"), the Crafts Inn Owners Association ("the Association"), Coin Depot Corporation ("CDC"), Herman J. Koehler, III, ("Koehler"), Alice Richter ("Richter") and Caesar Passannante ("Passannante"), Fernot having voluntarily discontinued this claim against the Stirrup Cup Lounge ("the Lounge") which was not represented at trial. The IIED claim proceeded against CDC, Koehler and Passannante, the plaintiff having voluntarily discontinued this claim against the other defendants. The federal claims, Title VII sex discrimination claims, which parallel the FEPA claims, and the Equal Pay Act claim, were tried to the

1. Fernot also made a claim of assault and bat-tery, which was voluntarily dismissed during tri-

court against all seven defendants.[2]

### B. Jury Verdict

#### 1. FEPA Claims

CII, CDC, Koehler, Richter and Passannante were found liable on all three claims. The Association was found not liable on all three claims. The compensatory damages for all three claims were considered together and were found to be $215,000. Punitive damages were assessed against Koehler and Passannante only in the amounts of $50,000 and $2,500 respectively.

#### 2. IIED

Koehler and Passannante were found liable. CDC was found not liable. The compensatory damages were found to be $125,000. Punitive damages were assessed against Koehler and Passannante in the amounts of $40,000 and $2,500 respectively.

### C. Facts

■ On this motion for judgment as a matter of law, the evidence must be taken in the light most favorable to the plaintiff, including all reasonable inferences which might have been drawn in her favor. *Concerned Area Residents for the Environment v. Southview Farm,* 34 F.3d 114, 117 (2nd Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995). In such a light, the facts were as follows.

#### 1. Parties

Fernot was a co-resort manager at the Inn from September, 1988, until July, 1989. In that position, she was paid by the Association. She had worked at the Inn in various positions, including marketing, since 1985.

At all times relevant, the Inn was a time-share resort, CII was a general partner in the Crafts Inn Limited Partnership ("the Partnership"), which was involved in marketing the time-shares at the Inn but was not a party, and the Association was an organization of the owners of time-shares at the Inn and was involved in maintaining the Inn for

the owners with such services as housekeeping and reception. The Lounge was a restaurant at the Inn.

Based in Elizabeth, New Jersey, CDC was at all times relevant an armored trucking company which collected, sorted and organized coins for banks in the New York City and New Jersey area. It was owned and operated by Koehler.

At all times relevant, Koehler was the developer of the Inn and a limited partner in the Partnership, owning a 37% interest in it. Koehler or the accounting staff at CDC controlled "every dollar that came in and every dollar that went out" of the entities at the Inn. Koehler made most of the management decisions.

In June 1989, Koehler hired Passannante to revive the marketing by the Partnership of the time shares at the Inn. From mid-July, 1989, through at least the end of December, 1989, Passannante ran the marketing program, although he was not at the Inn every day. During the same period, Richter was the general manager and oversaw the employees of the Lounge, the Association and the Partnership on a day-to-day basis. Richter and Passannante were put in their positions by Koehler. Richter was paid by the Association and the Partnership from July, 1989, through at least the end of December, 1989. Passannante was paid by Koehler through the Partnership. Passannante and Richter reported to Koehler through Frank Murphy and Diane Karovic, who were formally employed as Vice Presidents of CDC.

#### 2. Other Major Participants

Robert Hall was general partner of the Partnership from 1984 through 1989 but during the relevant period he was at most general partner in name only. While Hall was general partner of the Partnership, he was paid by Koehler through CDC. After 1985, Hall and Fernot cohabited.

At all relevant times, Karovic was Koehler's assistant. Information to and directions

al.

**2.** Fernot voluntarily discontinued on all claims against the eighth defendant named in the Second Amended Complaint, Coin Devices Corporation, Inc., before trial.

from Koehler about the situation at the Inn would generally pass through her.

At all relevant times, Murphy was chief financial officer of CDC. He was the comptroller for the Inn. Richter would inform Murphy about "just about everything" she did. Murphy would inform Koehler of the situation at the Inn.

### 3. July: Initial Harassment

In mid-July, at Fernot's first meeting with Passannante, he told her "with a face and body like [yours], [you] can have anything [you] want at Crafts Inn," while holding her hand. Fernot did not respond other than by withdrawing her hand. She was embarrassed and insulted.

Fernot was with Passannante when he closed the restaurant towards the end of July. Without any indication of interest from Fernot, Passannante hugged Fernot and told her that he was happy that she had been there for him. Fernot was uncomfortable and uneasy. She hoped that if she ignored Passannante's conduct, he would stop.

Shortly after the closing of the restaurant, Fernot saw Passannante explode in anger when on the phone with CDC. Passannante was a large man, about six feet and well over three hundred pounds. Passannante's tantrum scared Fernot.

### 4. August: Continued Harassment

In July, Fernot was told by Passannante that she was to be moved from her position as resort manager to the position of "marketing director" and was told that Koehler wanted her out of her present position. Fernot began working for marketing in the first week of August. In that position, she was paid by the Partnership.

In mid-August, Fernot was in the main lobby. Passannante came in, grabbed Fernot, pressed her against him and spun her around the lobby. She tried to push Passannante away. She felt pain from the tightness of his grasp. She was embarrassed. Fernot had not flirted with Passannante, been playful with him or touched him. She was afraid because Passannante's conduct was continuing even though she had tried to ignore it.

One day, Passannante called Fernot into his office. He had an "Endless Vacation" magazine which had on its cover a mention of "Phucket, Asia." Passannante repeatedly asked Fernot to tell him what it said. She did not. He said "I'm going to take you there and you're never going to want to come back."

### 5. First Complaint and Continued Harassment

Fernot realized that she needed help. In addition to the specific incidents, whenever Passannante spoke to Fernot he stared at her breasts. He "was always making sexual comments" to Fernot, such as, that her legs went all the way to her neck. A couple of times, he asked Fernot to accompany him to his house, ostensibly to discuss marketing. When Fernot told Richter of these repeated statements, Richter said only that Fernot should not worry because Passannante was married.

### 6. September: Continued Harassment

One day in September, Fernot was told that Passannante wanted to see her in the restaurant. Fernot went. As she approached, Passannante was leering at her. Passannante said "You look great in that purple sweater. Do you know that purple is the passion color?" While putting his arms around her, Passannante asked "Do you want to show me how passionate you can be?" Fernot said no and left. She was "scared to death." Fernot thought that Passannante wanted to have sex with her and that if she did not she would lose her job.

### 7. Further Complaints

Fernot told Richter over the phone what Passannante had said. The next day she went to meet with Richter. She asked for a meeting with Passannante with someone else present. She told Richter about the incident in the restaurant and about Passannante's violent temper. Richter seemed uninterested and told Fernot, "If you don't do what Caesar tells you to do, you'll be fired." Fernot told Hall and asked him to tell Koehler.

About two weeks after the complaint to Richter, Passannante smashed a door in the Inn. The next day, in front of Fernot, Passannante said, "People in this place have to

do what they're told." He turned to Fernot and told her that she had "misunderstood." He tried to hug her again, but Fernot resisted and left.

In early October, Koehler sent Sharon Hunsinger (now Koehler) to the Inn to investigate Fernot's complaint on his behalf. Hunsinger met with Fernot and others. Fernot told Hunsinger of the purple sweater incident and that she needed help. Hunsinger's response was that Fernot needed to be more aggressive.

Koehler ordered Hall to meet with him in New Jersey. They had a long discussion about the allegations of sexual harassment. Koehler said, referring to Fernot and Linda Giove who also complained of harassment by Passannante, "[t]hese girls are lying, they're scum." He told Hall that he was "overruled[;] Caesar and Alice are taking over and you're going to resign and you're going to Florida."

8. November and December: Retaliation

Finally, in late October or early November, Fernot met with Passannante, Richter and Giove, the other marketing staff member. Fernot complained about Passannante's treatment of her. Soon after the meeting, the staff, Richter and Passannante stopped speaking to Fernot.

Fernot received a memorandum from Passannante dated November 15 which indicated that the phones needed to be answered seven days a week from noon until eight. Fernot received a memorandum from Passannante dated November 20, requiring that the phones be answered by the sales staff from eight to eight, seven days a week. She then received a memorandum from Richter dated November 21 which indicated that the hours were twelve to eight, weekdays, and eight to eight, weekends. Passannante, however, insisted that Fernot had to work from eight until eight, seven days a week. Fernot's hours had been twelve noon until eight in the evening, six days a week. While the memoranda said only that the phone must be answered in those hours and both Fernot and Giove were on the marketing staff, there were so many calls and so much other work to do that both were needed for all of the hours.

A memo on December 6 from Koehler to Richter, Passannante, Karovic and Hall read as follows:

"Effective immediately, *any* issues of *any* magnitude which have any bearing upon the activities of the Crafts Inn, vis-a-vis:

hiring of key personnel

firing of key personnel

changes in the relationship with the restaurant marketing

terms of holding Board of Directors Meetings

maintenance agreements

anything that can create controversy

will be discussed, understood and agreed upon by the aforementioned people.

*No one person* will instigate or implement anything to the contrary."

On December 18, Fernot was asked by Karovic to go to CDC in New Jersey to meet with Koehler. Hunsinger and Karovic were at the meeting; Koehler was not. Fernot mentioned Passannante's remarks, the purple sweater incident, his tantrums and that the staff was not speaking with her. Karovic said that if Hall and Fernot did not toe the line and do what they were told, they would be fired.

9. Termination

Passannante asked Koehler to fire Fernot. Koehler knew of Fernot's complaint. He did not look into that "kind of thing." Koehler made the decision to fire Fernot. On December 20, Fernot was told by Hunsinger that her draw was being cut off due to budgetary constraints. When Fernot asked Passannante if she was fired, Passannante, throwing her last paychecks at her, told her "Yes" and said to her, "Pack up your shit and get out!" Passannante said that the decision had come from New Jersey. Richter said that it wasn't her decision. Fernot asked Karovic for something in writing. She received on December 21 by fax with a CDC cover sheet a memorandum ostensibly from Richter and Passannante which said that the draw of the sales staff, which included only

Fernot and Giove, was being cut off due to budgetary restraint.

Fernot suffered depression, loss of sleep, nightmares and anxiety for months. She felt physically ill. She vomited and had diarrhea.

## IV. This Motion

### A. Introduction

The defendants found liable at trial now move for judgment as a matter of law or for a new trial or remittitur. The issues going to the claims decided at trial which are presented in support of the motion for judgment as a matter of law are as follows: "(1) defendants were not plaintiff's 'employers' under ... state law; (2) plaintiff failed to prove outrageous conduct to support her claim of [IIED]; (3) defendants are not liable for the acts of [ ] Passannante because he was an independent contractor; (4) plaintiff failed to prove a hostile work environment; (5) plaintiff failed to prove *quid pro quo* harassment; ... (7) because of the financial crisis the [P]artnership was in, defendant Koehler had the right to preserve his business investment by becoming involved in the day to day activities of the Partnership without losing his limited partner status[; and] (8) punitive damages should not be awarded where they are not expressly provided by statute." In support of their motion for a new trial defendants argue that "(1) the court erred by charging the jury to hold defendants liable if there was no internal complaint procedure established in the year 1989[ ] and (2) the damages awarded under [the FEPA claims] are excessive because they are unsupported by the evidence[ ]." The jury verdict must be upheld "unless the jury reached a verdict reasonable jurors could not have reached." *Milbank, Tweed, Hadley & McCloy v. Boon,* 13 F.3d 537, 542 (2nd Cir.1994) (citations omitted).

### B. FEPA

#### 1. FEPA and Title VII

■ With certain exceptions, FEPA is "patterned on Title VII of the Civil Rights Act of 1964, and the standards and burdens of proof under FEPA are identical to those under Title VII." *Hodgdon v. Mt. Mansfield Company, Inc.,* 160 Vt. 150, 161, 624 A.2d 1122 (1992) (citation omitted).

#### 2. Specific Claims

##### a. Hostile Environment

Defendants argue that Fernot failed to prove a hostile work environment. "A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule.and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Karibian v. Columbia University,* 14 F.3d 773, 779 (2nd Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994) (quoting *Harris v. Forklift Sys., Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)).

■ Defendants' contention is without merit. There were several episodes of unwanted physical contact. *See Carrero v. New York City Housing Authority,* 890 F.2d 569, 578 (2nd Cir.1989). As Fernot's supervisor, Passannante was her "immediate superior and chief evaluator," and, as such, "he held a position of power over her that, in combination with his unwelcome sexual advances, was tantamount to coercion." *Id.* Passannante's sexual remarks and constant leering provide the requisite pervasiveness. The fact that the testimony indicated that Passannante was "always" making sexual remarks and regularly leered at Fernot, rather than giving specific dates, does not negate its role in establishing a work environment of sufficiently pervasive sexual harassment.

■ In addition, the sexual advances are critical. While these advances make up the claim of *quid pro quo* harassment as well, "[h]ostile environment and *quid pro quo* harassment causes of action are not always clearly distinct and separate; [t]he discrimination which gives rise to them is not neatly compartmentalized but, as this case demonstrates, the two types of claims may be complementary to one another." *Id.* at 579. Sexual advances may create an environment which meets the requisite standard—one which "a reasonable person would find hostile or abusive." *Harris,* —— U.S. at ——, 114 S.Ct. at 370. Here, the advances themselves were pervasive, starting at the first

meeting between Passannante and Fernot and continuing in the invitations to work on marketing at his home, as well as the specific incidents, especially that involving the purple sweater. The persistence of the advances, Passannante's size and temper and the unwanted touching would put a reasonable person in fear of sexual assault. A workplace under such a fear is a hostile and abusive one, and the jury's verdict as to this issue will not be disturbed.

### b. Quid Pro Quo

■ Defendants contend that Fernot failed to prove a *prima facie* case of *quid pro quo* harassment. Such "harassment occurs when 'submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual.'" *Karibian*, 14 F.3d at 777 (quoting 29 C.F.R. § 1604.11(a)(2) (1993) (Equal Employment Opportunity Commission)). Defendants also assert that the *Carrero* court "held that '[t]he gravamen of a *quid pro quo* claim is that a tangible benefit or privilege is conditioned on an employee's submission to sexual blackmail and that adverse consequences follow from the employee's refusal.'" 890 F.2d at 579.

■ Defendants' contentions are without merit. There were numerous threats. The threat that submission to or refusal of a sexual advance would be the basis of an employment decision need not have been explicit. *See Carrero*, 890 F.2d at 573, 579. The question is whether the plaintiff had "a reasonable fear of some job-related reprisal." *Karibian*, 14 F.3d at 775–776, 779 (strongest explicit threat was that victim "owed" harasser for help at work). Passannante's proposition at their first meeting while grasping Fernot's hand, stating "with a face and body like [yours], [you] can have anything [you] want at Crafts Inn," could have been reasonably found to be a threat that Fernot's future depended on her submission to Passannante's advances. A reasonable juror could also have found that the suggestions that work be done at Passannante's house were sexual advances, the refusal of which would have consequences. Most strongly, when Fernot told Richter that Passannante, while

holding Fernot, had asked her if she "want[ed] to show [him] how passionate [she] [could] be," Richter, who was Fernot's supervisor, told Fernot that "If you don't do what Caesar tells you to do, you'll be fired."

■ Defendants' argument that *Carrero* established adverse consequences as an element in a *prima facie* case of refused *quid pro quo* harassment is incorrect. *Karibian*, 14 F.3d at 778. It is the attempt to coerce acceptance of the sexual advances which is at the core of *quid pro quo* harassment, whether the victim submits or refuses and whether particular employment decisions are affected or not. To create a requirement of actual adverse consequences in a refusal case would be to allow *quid pro quo* harassment to go unpunished so long as the threats were not carried through.

Defendants argue that Fernot suffered no actual adverse consequences and that the alleged consequences were not "causally related to Plaintiff's rejection of [ ] Passannante's advances." Even if adverse consequences were necessary to make out a *prima facie* claim of *quid pro quo* harassment where the advances are refused, as in the present case, defendants' factual assertions are incorrect because the case is not "void of any such evidence." There were adverse consequences. After Fernot had refused Passannante's sexual advances, her working conditions were made intolerable. The staff stopped speaking to her. Her hours were dramatically increased in three contradictory memoranda from Passannante and Richter. Passannante asked Koehler to fire her. Finally, she was fired. As to causation, a reasonable jury could have inferred that those consequences flowed from Fernot's refusal of Passannante's sexual advances and that Fernot suffered *quid pro quo* harassment. Therefore, the jury's finding will not be disturbed.

### c. Defendants as Employers

The version of FEPA applicable to this suit defines an employer, in pertinent part, as "any individual[ or] organization ... including any partnership ... [or] corporation ... doing business in or operating within this state which has one or more individuals per-

forming services for it within this state." 21 V.S.A. § 495d(1). With respect to supervisors, in one of the few departures from Title VII, this section did not contain the words "or any agent of such employer" until 1993, after the events in question and the filing of the suit. Vermont case law has not expanded upon the general definition. The jury was charged without objection that "[t]o be an employer, among other things, one must exercise a direct and significant degree of control over the complaining party's work environment." *See Goyette v. DCA Advertising, Inc.,* 830 F.Supp. 737, 744 (S.D.N.Y.1993).

██ Defendants contend that § 495(b), which indicates that FEPA should "not be construed to limit the rights of employers to discharge employees for good cause shown," limits the definition of employers to those with the power to terminate. Defendants assert that if one cannot fire, then one is not an employer, which in logic would follow from § 495(b) only if § 495(b) asserted that if one is employer, then one can fire. However, § 495(b) does not assert that. More importantly, § 495(b) is not even in the definitions section, § 495d. The definition of employer simply does not contain a requirement that to be an employer one must have the power to fire. § 495d(1).

### (1) CII

██ CII was the general partner of the Partnership. Fernot was paid by the Partnership from August through her termination. Her marketing activity was for its benefit. It was clearly her employer. Thus, because the Partnership was responsible as Fernot's employer, so is CII. *See* 11 V.S.A. § 1399 (1993) ("A general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners") and 11 V.S.A. § 1207(1) (1993) ("All partners are liable [ ] [j]ointly and severally for everything chargeable to the partnership under section[ ] 1205 [wrongful acts of partner]"); *see, also, Concra Corporation v. Andrus,* 141 Vt. 169, 174, 446 A.2d 363 (1982) ("Partners are both jointly and severally liable for

torts"); *cf. Virgo v. Riviera Beach Associates, Ltd.,* 30 F.3d 1350, 1362 (11th Cir.1994) (finding general partner individually liable under Title VII for the acts of the president of an agent of the partnership under Florida partnership law virtually identical to Vermont law).

### (2) CDC

CDC contends that "although Coin Depot assets, machinery and personnel were used, there was no evidence that Coin Depot conducted its armored truck business or any other business in Vermont." Taking the evidence in the light most favorable to the plaintiff, CDC's employees were involved in the running of the Partnership. CDC's Vice President Murphy did the books. CDC's Vice President Karovic was in contact and consultation with Richter, the Partnership's day-to-day manager. CDC's accounting staff controlled the accounts of the entities at the Inn. Karovic called Fernot to a meeting in New Jersey at CDC. Fernot was told that the decision to fire her came from New Jersey. The letter indicating that her draw was cut off was faxed under a cover sheet with a CDC letterhead.

However, CDC's employees who were involved were not acting in furtherance of CDC's business but were merely acting as agents of Koehler in his capacity as general partner of the Partnership. Their authority over Fernot derived solely from Koehler's authority as general partner. Thus, they were at most merely supervisors.

██ The question, then, is whether a supervisor can be individually liable under FEPA. In *McHugh v. University of Vermont,* 758 F.Supp. 945, 949 (D.Vt.1991) *aff'd* 966 F.2d 67 (2nd Cir.1992), Fred I. Parker, then-District Judge[3], held that a co-worker and a supervisor were not employers under FEPA of a secretary whom they allegedly harassed. Judge Parker considered the omission of the "or any agent" language significant, and, therefore, distinguished cases under Title VII which had held supervisors liable. *Id.* This court agrees.

---

**3.** When *McHugh* was decided, Judge Parker was a Judge of the District of Vermont. He became a

Judge of the United States Court of Appeals for the Second Circuit in October, 1994.

Plaintiff argues that the Vermont Supreme Court's language in *Hodgdon* that "the standards and burdens of proof under FEPA are identical to those under Title VII" should apply even when the language of the statutes differ. Plaintiff further argues that the 1993 amendment of the statute to include agency language after Judge Parker's decision in 1991 creates "a reasonable inference" that the legislature was effectively overruling Judge Parker.

Plaintiff's contentions give too little credit to the Vermont legislature and are without merit. Plaintiff reads too much into the language of the Vermont Supreme Court in asserting that the language of FEPA should be ignored when it differs from Title VII simply because FEPA generally tracks Title VII. This cannot be the case; for example, as plaintiff herself points out, FEPA has provided for damages since 1981, 21 V.S.A. § 495b(b), while, Title VII did not until the 1991 amendments.

■ Therefore, because CDC was at most only Fernot's supervisor and a supervisor cannot be individually liable under FEPA, CDC is not liable to Fernot on her FEPA claims.

### (3) Koehler

■ Koehler was ostensibly a limited partner. However, a reasonable jury could have found that he was in control of the Partnership. Thus, he is liable as a general partner because he took "part in the control of the business." 11 V.S.A. § 1397. Thus, as with CII, he is responsible as Fernot's employer.

Koehler contends that "[b]ecause [he] saw a need and because he acted to help that cause, there is no justification for the Court to find him a General Partner rather than the Limited Partner he had been all along." Koehler offers no competent authority to support his position that "because of the financial crisis the partnership was in, [he] had the right to preserve his business investment by becoming involved in the day to day activities of the partnership without losing his limited partner status." Koehler's argument is entirely without merit. Under Ver-

mont law, a reasonable jury could have found him liable as Fernot's employer because he was a de facto general partner of her employer.

### (4) Individual Supervisors

For the same reasons that CDC as a mere supervisor cannot be liable to Fernot under FEPA, individual supervisors, Passannante and Richter, cannot be liable under FEPA.

### d. Chargeable Employers

### (1) Judgment as a Matter of Law

Defendants contend that they cannot be liable for Passannante's acts because he was an independent contractor and was acting outside the scope of his employment.

### (a) Law

### i) FEPA as tort

In *State of Vermont v. RSD Leasing, Inc.*, No. § 822–86 CnC (Chittenden Super.Ct., April 28, 1988), the court granted summary judgment in favor of an employer for claims under FEPA by employees for hostile environment sexual harassment caused by their supervisor. Slip op. at 10. The plaintiffs "brought forward evidence of substantial, unwelcome, sexual conduct by [the supervisor], directed to each of the[m], in the workplace." *Id.* at 2. However, none of the plaintiffs complained to the owners or "even asked [the supervisor] to bring it to their attention[,] [n]one of the conduct occurred in the [owners'] presence [and] [t]here is nothing in the record suggesting they should have known about it." *Id.*

The court wrote that "Vermont's FEPA must be considered to have created a new tort—employment discrimination." *Id.* at 6. It concluded that "[w]e therefore think that vicarious liability for a FEPA tort should be measured by traditional tort standards for tort liability, at least where traditional damage remedies are at issue." *Id.*

The court considered the traditional tort standard that "[t]o hold a master liable for his servant's act, it must have been done to carry out the master's directions, express or implied, and not to effect some purpose of the servant alone; that is the act must have been done in furtherance of the master's

business and within the scope of the servant's employment." *Id.* at 7 (citing *Anderson v. Toombs,* 119 Vt. 40, 44–45, 117 A.2d 250 (1955)). It reported that "where the conduct of the servant is unprovoked, highly unusual, and quite outrageous, there has been something of a tendency to find that this in itself is sufficient to indicate that the motive was purely personal to the servant and vicarious liability should not attach." *Id.* It concluded that "[s]exual harassment, for the purposes of satisfying the employee's sexual proclivities, must fall into this category, at least without some further evidence of employer direction or condonation." *Id.* at 8.

The court concluded as follows:

[O]n the facts of this hostile environment case we rule that [ ] a complaint was necessary, in view of [the] total absence of evidence of actual or constructive knowledge of the supervisor's sexually harassing conduct by his supervisors. In another case, the circumstances may be sufficient to warrant vicarious liability, such as through evidence of unusual female employee turnover, harassing conduct in presence of the persons to whom a complaint might be made, or refusal to listen to grievances. The record does not require or permit our reaching such questions here. *Id.* at 9–10.

### ii) Independent Contractor

■ Defendants assert that Passannante was only an independent contractor and not an employee. The most important factor to consider in determining whether a worker is an employee or an independent contractor is the extent of control which, by agreement, the employer may exercise over the details of the work. *Verrill v. Dewey,* 130 Vt. 627, 635, 299 A.2d 182 (1972); *see Restatement (Second) of Agency* § 220(2)(a) (1958).

### (b) Application of Law to Facts

### i) Independent Contractor

■ Passannante reported to Murphy and Karovic who then reported to Koehler, general partner of the partnership. As made absolutely clear by the memorandum of December 6, Koehler had the authority to control any significant detail of Passannante's work. Although Koehler apparently did not exercise the power of control during the early months of Passannante's employment, it is his obvious ability to control which is sufficient to make Passannante an employee rather than an independent contractor.

### ii) Hostile Environment

■ *RSD* rejected automatic employer liability for supervisor hostile environment sexual harassment. It held that under traditional tort doctrine, such harassment without more is not the responsibility of the employer because it is done solely for the purposes of the employee. Slip op. at 8; *See McHugh,* 966 F.2d at 75 (citing *RSD* ). However, under traditional tort doctrine an employer may be liable for the acts of employees done outside the scope of employment and for their own purposes if the employees are "aided in accomplishing the tort by the existence of the agency relation." *Rest.* § 219(2)(d) and Comment e. Passannante was aided in his campaign of harassment by his position as supervisor. This would appear to create automatic employer liability in this case under traditional agency law as required by *RSD.*

Moreover, the jury was charged that in order for an employer to be liable for hostile environment sexual harassment the plaintiff must have shown that the employer "did not take reasonable steps to remedy the situation when it knew or should have known of the situation or did not provide a reasonable avenue of complaint." *See Karibian,* 14 F.3d at 780 (citing *Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 63 (2nd Cir.1992)). This court considers this to be in keeping with *RSD*'s emphasis that there must be actual or constructive knowledge before an employer can be liable for hostile environment sexual harassment. Slip op. at 9–10.

■ A reasonable jury could have found the following. The Partnership and, therefore, Koehler and CII as general partners knew of the complaints through the Partnership's agent Richter, who actually knew of the harassment through Fernot's complaints to her. CDC's employee Karovic, as an agent of Koehler as general partner, and

Koehler directly, as general partner, actually knew of the complaints from Richter, Hall, Passannante and/or Hunsinger. None of the defendants provided a reasonable avenue of complaint because Richter as agent for the Partnership, with Koehler and CII as general partners and CDC's employees Karovic and Hunsinger, as agents for Koehler as general partner, at best ignored and at worst rejected all of Fernot's complaints with directions to follow Passannante's orders. Therefore, the jury's finding of liability as to CII and Koehler on the hostile environment sexual harassment claim under FEPA will not be disturbed.

### iii) Quid pro quo

■ Koehler and CII's liability for Passannante's *quid pro quo* harassment is absolute. "Because the *quid pro quo* harasser, by definition, wields the employer's authority to alter the terms and conditions of employment—either actually or apparently—the law imposes strict liability on the employer for *quid pro quo* harassment." *Karibian* 14 F.3d at 777 (citation omitted). This court does not consider *RSD* to be to the contrary. *RSD* was not a *quid pro quo* case. In addition, the *Karibian* court's presentation of the basis for automatic liability for *quid pro quo* sexual harassment matches with traditional tort doctrine holding a principal liable "for torts of his servants acting outside the scope of their employment [if] . . . the servant . . . was aided in accomplishing the tort by the existence of the agency relation." *Rest.* § 219(2)(d).

Passannante was an employee and agent of the Partnership. He was sent to the Inn to improve marketing on behalf of the Partnership. *See Rest.* § 2. It was Passannante's position as agent and supervisor which invested in him the power to create the implicit threat of consequences for refusing his advances. *See Rest.* § 219(2)(d). Therefore, the jury's finding of liability as to CII and Koehler, general partners, on the *quid pro quo* sexual harassment claim under FEPA will not be disturbed.

### iv) Retaliation

■ The liability on the retaliation claim is also absolute because both Richter and Passannante, using their authority as agents and supervisors for the Partnership and, therefore, general partners CII and Koehler changed Fernot's working conditions, *see Rest,* § 219(2)(d), and even more directly because Karovic as agent for Koehler, as general partner of the Partnership of which CII was also general partner, fired Fernot upon his direction. Therefore, Passannante's status is irrelevant to this claim and the jury's finding of liability as to CII and Koehler on the retaliation claim under FEPA will not be disturbed.

### (2) New Trial/Remittitur

■ Defendants moved for a new trial on the basis that the jury charge was in error by allowing liability for hostile environment sexual harassment if they "did not provide a reasonable avenue for complaint." Defendants assert that this charge was based on an invalid retroactive application of 21 V.S.A. § 495h passed in 1993 which requires all employers to establish internal complaint procedures. However, the jury charge was not based on the new Vermont provision. Instead, it was based on settled law under Title VII generally incorporated by FEPA which allows employer liability for the failure to provide a reasonable avenue for complaint, a much less onerous requirement than that of § 495h. *See Karibian,* 14 F.3d at 780 ("the employer [ ] provided no reasonable avenue for complaint").

### e. Damages

### (1) Excessiveness

■ Defendants claim that the damages for the FEPA claims are excessive in that plaintiff's expert testified that damages for back pay were $167,000 and the award was $215,000 and, therefore, "the jury award must have been 'the result of passion or prejudice.'" (citation omitted). Defendants suggest that "[t]he only appropriate remedy . . . is a new trial on all issues or to reduce the verdict to $167,000." In fact, there were three elements to be considered in awarding damages: lost wages, lost benefits *and emotional damages*. Defendants' claim that damages were excessive is unsupportable.

### (2) Punitive

Defendants' claim that punitive damages are not available under FEPA is meritorious. FEPA does not mention punitive or exemplary damages. 21 V.S.A. § 495b(b). The Vermont legislature has authorized punitive or exemplary damages by name in numerous statutes, *see, e.g.,* 9 V.S.A. § 2461 (1993) (consumer fraud), including anti-discrimination statutes. *See, e.g.,* 13 V.S.A. § 1457 (Supp.1994) (hate crimes). The Vermont Supreme Court has refused to imply a civil remedy where there was "serious doubt about whether the Legislature intended" to create one. *O'Brien v. The Island Corporation,* 157 Vt. 135, 140 n. 3, 596 A.2d 1295 (1991). The court noted its power to "determine that such a remedy is appropriate in furtherance of the legislative purpose," but concluded that "it should be hesitant to do so when it is clear that the Legislature could have done so, knew it could do so, and did not do so." *Id.* This court is even more reluctant to imply the availability of punitive damages into a Vermont statute when the Legislature has not provided for them, and the Vermont courts have not interpreted the statute as providing for them.

Plaintiff argues that some of the statutes which have provided for exemplary damages have limited them or allowed such awards where they would not have been available at common law, such as contract claims. Some of the statutes do limit the amount of exemplary damages. *See, e.g.,* 9 V.S.A. § 2461. However, the plaintiff has no response to, for example, the anti-hate crime statute. 13 V.S.A. § 1457 (Supp.1994). This statute does not limit punitive damages. An assault, for example, covered by the statute would be "maliciously motivated" by bias. 13 V.S.A. § 1455 (Supp.1994). Therefore, punitive damages would surely have been available at common law for such an attack. If availability of punitive damages at common law were sufficient for punitive damages to be recovered under a statute, the anti-hate crime statute's provision for punitive damages would be redundant. This court will not say that the Vermont Legislature's inclusion or exclusion of provisions for punitive damages in its statutes is haphazard.

Plaintiff's contentions fail. Defendants' motion for judgment as a matter of law with respect to the punitive damages under FEPA is granted, and the jury award of those damages is set aside.

### C. Intentional Infliction of Emotional Distress

#### 1. Law

Defendants claim that "plaintiff failed to prove outrageous conduct to support her claim of intentional infliction of emotional distress." Defendants cite various formulations of the standard for IIED as quoted by Vermont courts.

The issues are whether certain "conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," *Mancini v. General Electric Co.,* 820 F.Supp. 141, 148 (D.Vt.1993) (citation omitted), and whether there was "distress so severe that no reasonable person could be expected to endure it." *Baldwin v. Upper Valley Services, Inc.,* 162 Vt. 51, ——, 644 A.2d 316, 319 (1994) (citation omitted). "It is for the court to determine as a threshold question whether a jury could reasonably find that the conduct at issue" was "so outrageous and extreme as to 'go beyond all possible bounds of decency.'" *Jobin v. McQuillen,* 158 Vt. 322, 327, 609 A.2d 990 (1992). "Absent at least one incident of behavior that transcends the ignoble and vast realm of unpleasant and often stressful conduct in the workplace, incidents that are in themselves insignificant should not be consolidated to arrive at the conclusion that the overall conduct was outrageous." *Denton v. Chittenden Bank,* —— Vt. ——, ——, 655 A.2d 703, 706 (1994) (citations omitted). The Vermont Supreme Court has upheld a jury verdict of intentional infliction of emotional distress affirming a denial of a motion j.n.o.v where the claim was based on the outrageous nature of the actual termination. *Crump v. P & C Food Markets, Inc.,* 154 Vt. 284, 296–297, 576 A.2d 441 (1990). However, the District of Vermont, following Vermont IIED law, has found that verbal abuse and even the raising of an arm during

a termination were insufficient to make out a claim for intentional infliction which could survive summary judgment. *Ploof v. Brooks Drug, Inc.*, Civ. A. No. 89–270, 1991 WL 497170 at *6–7 (D.Vt. Aug. 28, 1991).

### 2. Application of Law to Facts

#### a. Koehler

Taking reasonable inferences most favorable to the plaintiff, Koehler retaliated against Fernot for her complaints of sexual harassment. Koehler had her called down to New Jersey ostensibly to meet with him. He did not even attend the meeting, but his agents dismissed her complaints and told her to, "Toe the line." Koehler fired her the week before Christmas.

▮▮▮▮ None of the individual events which make up the course of the retaliation in this case were sufficiently outrageous to establish a *prima facie* case of IIED. *See Crump.* A string of individually unactionable events cannot be taken together to establish a *prima facie* case of IIED. *Denton.* This court does not read this proposition of Vermont law to change if the conduct constitutes a violation of FEPA. This court also does not read Vermont law to indicate that a *prima facie* case of retaliation for complaints of sexual harassment under FEPA necessarily constitutes a *prima facie* case of IIED. *Cf. Paroline v. Unisys Corp.*, 879 F.2d 100, 108, 112–113 (4th Cir.1989), *vacated in part on other grounds,* 900 F.2d 27 (4th Cir.1990) (upholding a grant of summary judgment against a claim of intentional infliction of emotional distress, while reversing a grant of summary judgment against a claim for sexual harassment on the same facts). Therefore, because Koehler's conduct was insufficiently outrageous to make out a *prima facie* case of IIED, the jury verdict against Koehler on the IIED claim is set aside, judgment as a matter of law is granted for Koehler on this claim, and it is dismissed.[4]

4. The court notes that the emotional damages that were awarded under FEPA against Koehler duplicated in part the damages awarded against

#### b. Passannante

▮▮▮ Passannante subjected Fernot to sexually suggestive remarks, unwanted touching, constant leering, and numerous sexual advances. After Fernot refused his advances and complained to Richter, Passannante retaliated against Fernot by dramatically increasing her hours. Finally, when Fernot asked if she had been fired, Passannante, throwing her final paychecks at her, responded "yes" and said to her, "Pack up your shit and get out!"

The legal reasoning which leads to the conclusion that Koehler's conduct is not actionable as IIED results in the same conclusion with respect to Passannante's conduct. Therefore, because Passannante's conduct was insufficiently outrageous to make out a *prima facie* case of IIED, the jury verdict against Passannante on the IIED claim is set aside, judgment as a matter of law is granted for Passannante on this claim, and it is dismissed.

### V. Conclusion as to State Law Claims

CDC, Passannante and Richter are dismissed from the FEPA claims as a matter of law. The punitive damages under FEPA are dismissed as a matter of law. The IIED claims are dismissed as a matter of law. The remaining elements of the motion for judgment as a matter of law, and the motion for new trial or remittitur are denied. The jury's finding of liability and compensatory damages as to CII and Koehler under FEPA are affirmed.

### VI. Decision on Federal Claims

#### A. Title VII

##### 1. Findings of Fact

Taking the jury's verdict on the FEPA claims as advisory, this court incorporates the factual discussion set forth above as its findings of fact for the federal Title VII claims.

In addition, the court finds the facts as follows.

Koehler for IIED. This issue has been mooted by the dismissal of the IIED claim.

In 1989, CDC employed over 1,000 people and at no time during that year had less than 15 employees. CDC did not operate its coin collecting business in Vermont. Koehler did not individually employ anyone.

In 1989, for each working day in each of at least twenty calendar weeks, the Partnership, and therefore CII and Koehler as general partners, employed Fernot, Richter, Passannante and Giove. For each working day in each of at least twenty calendar weeks, the Association employed two people in Richter's office. For each working day in each of at least twenty calendar weeks, the Association employed to run the front desk one person, full-time, and four people, part-time. For each working day in each of at least twenty calendar weeks, the Association employed one person per department in housekeeping, laundry and maintenance. For each working day in each of at least twenty calendar weeks, the Lounge employed thirteen people.

Karovic and Richter as agents of Koehler as general partner of the Partnership exercised a limited degree of control over the Association. Passannante as agent of Koehler as general partner of the Partnership exercised control over the Lounge. The Lounge did not pay Fernot anything in any form during the relevant period. The Lounge paid its payroll through its own revenues and received no funds from any other entity for that purpose. Fernot incidentally assisted the Lounge and the Association in August.

## 2. Law

■ Title VII limits its definition of an employer to one "who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b). "Two [ ] entities may be given single employer status such that their combined number of employees will be determinative of whether they are subject to Title VII requirements." *Armbruster v. Quinn*, 711 F.2d 1332, 1338 (6th Cir.1983). There are four factors used "to determine whether the entities are sufficiently related to warrant joint liability for the acts of the immedi-

ate employer.... (1) centralized control of labor relations; (2) interrelated operations; (3) common management; and (4) common ownership." *Dewey v. PTT Telecom Netherlands, U.S., Inc.*, No. 94 Civ. 5983, 1995 WL 425005 at *2 (S.D.N.Y. July 19, 1995) (citations omitted). "The most important factor in the 'single employer analysis' is the degree of centralized control of labor relations and whether it exceeds 'the control normally exercised by a parent corporation which is separate and distinct from the subsidiary.'" *Id.* (citation omitted). "Common ownership alone is insufficient to establish application of the single employer doctrine." *Id.* at *3 (citations omitted). "Courts do not readily find that related entities are single employers in discrimination cases." *Id.* at *2 (citation omitted)

## 3. Application of Law to Facts

Fernot was directly employed by the Association in July. She was directly employed by the Partnership from August until December when she was fired. These periods of employment did not overlap. The Lounge and CDC were never her direct employers during the relevant period. Her incidental assistance in the Lounge and the Association in August were insufficient to create an employer-employee relationship.

■ Only CDC meets the jurisdictional threshold on its own. The fact that Koehler wholly owned CDC does not justify ignoring the corporate form and attributing its employees to him individually. *Cf. Johnson v. Flowers*, 814 F.2d 978, 980 (4th Cir.1987). Therefore, the central question is whether the number of employees of the Association or the Partnership may be aggregated with each other or with the Lounge or CDC to meet the Title VII jurisdictional threshold. This question breaks down into horizontal and vertical components. First, whether the entities at the Inn, the Association, the Partnership and the Lounge were "sufficiently related" to be treated as a single employer. *Dewey* at *2. Second, whether the Association or the Partnership and CDC were "sufficiently related." *Id.*

■ The entities at the Inn were not sufficiently interrelated to form a single employer. During the relevant period, the Association, Partnership and Lounge did have common management and centralized labor relations through Richter and Passannante as agents for Koehler, general partner of the Partnership. *See Dewey* at \*2. A few of CDC's employees, as agents for Koehler, general partner, also played a role in managing the Partnership and to a much lesser extent the Association. *See id.* While the Association and the Partnership wanted the Lounge to succeed, their operations were not interrelated. *See id.* There is no evidence that the Association or the Partnership owned the Lounge. *See id.* While the Partnership was a member of the Association because it was the owner of the unsold time shares, it did not own the Association. *See id.* Koehler owned a stake in the Partnership but did not own the Association or the Lounge. *See id.* The parties have not cited nor has the court found a case in which a plaintiff has been directly employed by one entity which failed the jurisdictional minimum but has established that threshold by agglomerating the employees of other entities only horizontally related to the direct employer but which clearly did not employ the plaintiff or control her work in any significant way. The court concludes that the Association, Partnership and Lounge were not sufficiently related to form a single employer and, therefore, the number of employees of each may not be aggregated to meet the Title VII jurisdictional threshold.

■ The Association was not sufficiently related with CDC to form a single employer. CDC's employees did play a minor role in managing the Association but more importantly exercised little control over its employees. *See id.* The operations of the Association and CDC were not in any way interrelated. *See id.* CDC was an armed car company, not a hotel chain. Neither Koehler nor CDC owned the Association. *See id.* Given the lack of interrelated operations and ownership, the minor part played in managing the Association by a few of CDC's employees as agents for Koehler is insufficient to find that the Association and CDC formed a single employer.

■ The Partnership was also not sufficiently related to CDC to form a single employer. A few of CDC's employees did play a role in the Partnership's labor relations. *See id.* However, they did so as agents of and carrying out the directions of Koehler, general partner of the Partnership. The operations of the Partnership and CDC were totally unrelated. *See id.* CDC did not carry on its armed car business in Vermont nor was it directly involved in time share marketing. *See id.* A few of CDC's employees did play a role in managing the Partnership, but again they did so only as agents of and under the direction of Koehler, general partner. *See id.* Koehler owned CDC and was a substantial stakeholder in the Partnership. *See id.* However, the fact that Koehler owned CDC and a substantial stake in the Partnership is not sufficient to establish that the two were a single employer. *See id.* at \*3. CDC did not have any interest in the Partnership. Therefore, the facts of this case do not fit the common parent-subsidiary pattern. *See id.* at \*2. This fact is critical to this case. "The single employer doctrine is not limited to parent-subsidiary relationships, but the issue becomes more difficult when considering two separate [entities] owned by a single" person. *Rogers v. Sugar Tree Products, Inc.,* 7 F.3d 577, 583 (7th Cir.1993). This court concludes that where, as in this case, some employees of one company simply manage another company as agents for and under the direction of a common owner and where the managing company does not have an interest or other interrelation with the managed company, the two companies are not sufficiently related for the number of their employees to be aggregated for purposes of Title VII jurisdiction.

Because neither of Fernot's direct employers were sufficiently integrated with another entity to aggregate the number of employees, Fernot has failed to meet the Title VII jurisdictional minimum. Therefore, the claims under Title VII are dismissed.

### B. Equal Pay Act

#### 1. Claim

Fernot claims that defendants CII, CDC, the Association, Koehler, Passannante and

Richter violated her rights under the Equal Pay Act by paying Steven Kopri, who replaced her as marketing director, more for performing substantially the same job.

### 2. Findings of Fact

This court adopts as its findings of facts for this federal claim the facts as set forth in reference to the state claims and finds additional facts as follows.

When Fernot was first in marketing at the Inn in 1985, she toured clients. In 1987, when Fernot was assistant to the director of marketing, she trained the rest of the staff, helped with the paperwork, typed and checked contracts, toured clients and sold time-shares herself. In 1987, she also covered front desk breaks, helped in housekeeping, worked in the garden and worked in maintenance. As marketing director in November and December, 1989, Fernot with Giove's assistance answered the phones, followed up on the incoming calls with mailings and phone calls 84 hours a week.

Steven Kopri worked in marketing at the Inn in 1990. He "was responsible for producing sales." He would "obtain sales, close sales, do the final contracts and paperwork." He trained other employees. He handled the marketing program himself, although he may have had an assistant for part of the time.

### 3. Law

In order to establish a violation of the Equal Pay Act, a plaintiff must prove that her job is "substantially equal" to that of a higher paid male employee. *Lambert v. Genesee Hospital*, 10 F.3d 46, 56 (2nd Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). "However, where jobs are merely comparable, an action under the Equal Pay Act will not lie." *Id.*

### 4. Application of Law to Facts

At no time did Fernot hold a job that was "substantially equal" to that of Kopri. Even when she had the title of marketing director, she was not in charge of the marketing program, as he was. Because Fernot did not prove that she performed a job that was "substantially equal" to that of Kopri, her claim under the Equal Pay Act is dismissed. Therefore, the court need not pass upon which, if any, of the defendants would have been chargeable as Fernot's employer under the Act.

### VII. Conclusion

Judgment is granted to the plaintiff against defendants Crafts Inn Inc. and Herman J. Koehler, III in the amount of $215,-000 under FEPA claims for hostile environment and *quid pro quo* sexual harassment and retaliation for complaints thereof, tried to the jury as Claims 1–3 and set forth in the Second Amended Complaint as the Fifth and Sixth Causes of Action. Judgment as a matter of law is granted to defendants Coin Depot Corporation, Caesar Passannante and Alice Richter as to these claims, and to that extent they are dismissed. Judgment as a matter of law is granted to defendant Herman J. Koehler, III as to the award of punitive damages.

Judgment as a matter of law is granted to defendants Herman J. Koehler, III and Caesar Passannante as to the claims for the intentional infliction of emotional distress, tried to the jury as Claim 4 and set forth in the Second Amended Complaint as the Seventh Cause of Action, and they are dismissed.

The Court finds for the defendants under Title VII, for hostile environment and *quid pro quo* sexual harassment and retaliation for claims thereof, the First, Second and Fourth Causes of Action in the Second Amended Complaint, and they are dismissed.

The Court finds for the defendants on the claims under the Equal Pay Act, the Third Cause of Action in the Second Amended Complaint, and they are dismissed.

Let the clerk enter judgment accordingly.

So Ordered.