**Linda BUTTA–BRINKMAN, Plaintiff,**

v.

**FCA INTERNATIONAL, LTD. d/b/a Financial Collection Agencies, Inc., Defendant.**

**No. 95 C 3632.**

United States District Court, N.D. Illinois, Eastern Division.

Oct. 28, 1996.

---

Ernest Thomas Rossiello, Margaret Ann Zuleger, Elena M. Dimopoulos, Rossiello & Associates; and Margaret Moira Smith, Cook County State's Attorney, Chicago, IL, for Plaintiffs.

Bruce R. Alper, Janet Marie Hedrick, Valerie Depies Harper, Vedder, Price, Kaufman & Kammholz, Chicago, IL, Allan M. Dabrow, Gina M. Ameci, Peter A. Muhic, and Mitchell Feigenbaum, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, PA, for Defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge:

Plaintiff Linda Butta–Brinkman was employed by Defendant Financial Collection Agencies, Inc. (FCA) from September 1994, until May 1995. Butta–Brinkman claims that during this period she was subjected to continuous sexual harassment by her supervisor, Robert Wagaman, and that this conduct violated Title VII of the Civil Rights Act of 1964 (codified as amended at 42 U.S.C. § 2000e et seq.). FCA has moved for summary judgment. For the reasons set forth below, we grant the motion in part and deny it in part.

### I. Summary Judgment Standard

"A district court must grant summary judgment where the record before it shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Smith v. Shawnee Library Sys.,* 60 F.3d 317, 320 (7th Cir.1995) (quoting Fed.R.Civ.P. 56(c)). The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If this burden is carried, the non-movant "must set forth specific facts showing that there is a genuine issue for trial" in order to defeat summary judgment, and cannot merely rest on the allegations contained in the pleadings. Fed.R.Civ.P. 56(e); *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553. In deciding a motion for summary judgment we read the facts in a light most favorable to the non-moving party, *Cuddington v. Northern Ind. Public Serv. Corp. (NIPSCO),* 33 F.3d 813, 815 (7th Cir.1994), and draw reasonable inferences from those facts in the non-movant's favor. *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). What follows in the *Factual Background* section is a version of the facts drawn from the parties' submissions, with any differences between them resolved, for purposes of this motion, in Butta–Brinkman's favor.[1]

---

1. Under General Rule 12(M) of the United States District Court for the Northern District Court of Illinois, a party moving for summary judgment must submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party

## II. Factual Background

FCA, a company engaged in the business of debt collection, hired Linda Butta–Brinkman as a sales representative in its Lombard, Illinois office in September 1994. Butta–Brinkman reported to Robert Wagaman, FCA's vice-president of United States sales, who had the power to fire her and to control her working conditions. Not long after Butta–Brinkman began working for FCA, Wagaman began harassing her by making sex-related comments, propositions, and threats. Wagaman's crude remarks included responding to Butta–Brinkman's request for brochures and other marketing materials by suggesting that she use her legs and body to persuade clients to place orders, and referring to Butta–Brinkman as his "sexiest and best built rep." Pl.'s Dep. at 57–58. Wagaman also made a number of threats and promises of varying degrees of subtlety which were intended to induce Butta–Brinkman to have sex with him. For example, at one point Wagaman told Butta–Brinkman—in response to her request for written performance goals—that "your only goal is to be pleasing me and making me happy," and that "your goal is that you let me spread your legs." In a different encounter Wagaman asked her, "don't you realize that the way most women get ahead is by sleeping with their boss?" Wagaman also made explicit threats to fire Butta–Brinkman if she refused to sleep with him, such as telling her "you are going to be my nighttime whore, and your fee will be keeping your job." Pl.'s Dep. at 60, 145, 442, 482. In addition to Wagaman's persistent verbal harassment, on one occasion he reached under Butta–Brinkman's skirt and grabbed her thigh. Pl.'s 12(N) ¶ 37.

Butta–Brinkman kept detailed notes of the harassment she experienced, but she did not report any of Wagaman's conduct to anyone in FCA's Human Resources Department or to any of his superiors [2] prior to filing suit.[3] Def.'s·12(M) ¶¶ 42–45. Butta–Brinkman was aware of FCA's explicit policy prohibiting sexual harassment. This policy was clearly articulated in FCA's employee handbook, a copy of which Butta–Brinkman possessed, and it was posted in two notices in her office, which Butta–Brinkman admits having seen. Def.'s 12(M) ¶¶ 8–10. Butta–Brinkman was also aware of the available methods of pursuing a sexual harassment complaint: she knew that she could report Wagaman's conduct to Tom Foy (Wagaman's boss) or to Caren Hosansky, FCA's Vice President of Human Resources. Def.'s 12(M) ¶¶ 16–22. Under Hosansky, FCA's Department of Human Resources has responded aggressively to sexual harassment claims: the Depart-

to judgment as a matter of law." The nonmovant must then specifically respond to each of the movant's factual assertions, and include, "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 12(N)(3)(a). The facts asserted in the movant's 12(M) Statement will be deemed admitted if the non-movant's responses do not contain citations to specific portions of the record supporting the contrary position. *Skagen v. Sears, Roebuck & Co.*, 910 F.2d 1498, 1500 (7th Cir.1990). In addition, under Local Rule 12(N)(3)(b), the nonmovant may submit a statement of additional facts that the nonmovant contends require denial of the motion, and Local Rule 12(M) provides that the movant must likewise respond to the 12(N)(3)(b) Statement or risk admission of noncontroverted facts. Our discussion in the *Factual Background* section is based on the information contained in FCA's and Brinkman's Rule 12 Statements.

2. It appears that Wagaman was at the fourth level of the FCA corporate hierarchy: above him were Edwin Jarmain, the Chairman of FCA, John Moynan, President, Tom Foy, FCA's Vice Presi-

dent of Sales for North America, and a number of "senior" and "executive" Vice Presidents. Def.'s Reply Br. at 7; Reply Ex. 14. Tom Foy resigned in November 1994, and Wagaman temporarily assumed his responsibilities.

3. Plaintiff's counsel argues that Butta–Brinkman did give notice of the harassment—albeit not through official channels—to some of her coworkers at FCA. Pl.'s Br. at 13–14. Although this claim may or may not be true, it is a misrepresentation of the facts insofar as they are currently established. For example, plaintiff's counsel asserts that "Brinkman complained to Mike Peters ... that Wagaman was acting inappropriately toward her," and refers us to a number of paragraphs in Plaintiff's 12(N) Statement as well as an exhibit. *Id.* But an examination of these references (and the deposition testimony on which they are based) reveals only that Peters warned Butta–Brinkman about Wagaman's proclivities: there is no evidence that she lodged any form of "complaint" with Peters or told him any details of Wagaman's harassment.

ment has investigated 23 formal and informal sexual harassment complaints, 17 of which resulted in some form of disciplinary action being taken by the company against the accused harasser (ranging from written warnings to terminations). Def.'s 12(M) ¶ 29. An outside expert [4] retained by FCA to review its sexual harassment policies and procedures concluded, *inter alia*, that FCA has "a clear specific policy against sexual harassment," and that "women at FCA have every reason to expect a prompt, thorough investigation, and prompt, effective remedial action when they bring forward a complaint of harassment." Blunt Aff. at 1. Butta–Brinkman sets forth no evidence to contradict this assessment of the effectiveness of FCA's sexual harassment grievance procedures.

FCA's first notice of Wagaman's conduct towards Butta–Brinkman was contained in a letter dated February 24, 1995, which consisted of plaintiff's counsel's Notice of Attorney's Lien for a sexual harassment claim. Def.'s 12(M) ¶ 43, 53. When Hosansky attempted to speak with Butta–Brinkman about the substance of her complaint, Butta–Brinkman refused to discuss the matter with Hosansky and referred her instead to plaintiff's counsel. Def.'s 12(M) ¶ 58. Despite Butta–Brinkman's silence, after receiving the Notice of Lien Hosansky commenced an investigation of Butta–Brinkman's allegations, and notified Wagaman that his future contact with Butta–Brinkman would be monitored. Def.'s 12(M) ¶ 59. Wagaman perpetrated no further acts of harassment after that point. Def.'s 12(M) ¶ 56.

In late February 1995, about the same time FCA received the Notice of Lien from plaintiff's attorneys, Butta–Brinkman began seeing a physician for treatment of physical and emotional problems (such as depression, chest pains, and difficulty holding down food) that she was experiencing as a result of Wagaman's harassment. Pl.'s 12(N) ¶ 84. These symptoms subsequently became more serious, resulting in Butta–Brinkman being

hospitalized, and forcing her to take a medical leave of absence in late March. Pl.'s 12(N) ¶ 89. At roughly the same time, Wagaman refused to give Butta–Brinkman a raise and placed her on a "performance plan." Pl.'s 12(N) ¶ 85, 87. On May 31, 1995, Butta–Brinkman resigned from FCA. Pl.'s 12(N) ¶ 90.

### III. Sexual Harassment Claims

Title VII's prohibition against discrimination on the basis of sex includes sexual harassment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). Sexual harassment claims fall into two categories: (1) "hostile work environment" claims, where an employer's conduct—or conduct by an employee that can be attributed to the employer—creates a work environment that is hostile or abusive to the plaintiff, *Saxton v. AT & T Co.*, 10 F.3d 526, 535 (7th Cir.1993) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)), and (2) *quid pro quo* claims, where submission to sexual demands is made a condition of tangible employment benefits, *Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456 (7th Cir. 1990). Butta–Brinkman contends that she was subjected to both types of sexual harassment, and we consider each claim separately.

#### A. Hostile Work Environment

To prevail on her hostile work environment claim, Butta–Brinkman must eventually prove that: (1) Wagaman's harassment was " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' " *Harris*, 510 U.S. at 21, 114 S.Ct. at 370 (quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405); and (2) traditional principles of agency law would render FCA liable for Wagaman's harassing conduct, *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2407–08; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir.1994).[5] For purposes of the instant mo-

---

4. FCA's expert is Kathleen Blunt, who served as a Senior Executive with the Milwaukee and Chicago offices of the Equal Employment Opportunity Commission from 1982–1989, and currently works as a consultant in sexual harassment prevention.

5. Seventh Circuit cases send mixed signals regarding whether agency principles must be applied when harassment is perpetrated by a supervisor against a subordinate employee. Several cases seem to say that if the harassment comes from a management-level supervisor, the employ-

tion, FCA concedes that Wagaman's harassment created a hostile and abusive working environment for Butta–Brinkman. Def.'s Br. at 1. Butta–Brinkman's claim runs into serious trouble at the agency law stage of the inquiry, however. In applying traditional agency law principles to corporations accused of hostile environment sexual harassment, a number of federal courts have adopted the following bright-line rule:

> [When] an employer has taken energetic measures to discourage sexual harassment in the workplace and has established, advertised, and enforced effective procedures to deal with it when it does occur, it must be absolved of Title VII liability under a hostile work environment theory of sexual harassment. That defense depends, of course, on the ability of the employer to establish that its employees could not reasonably have failed to know of those measures and that its grievance procedures were clearly "calculated to encourage victims of harassment to come forward."

*Gary v. Long,* 59 F.3d 1391, 1398 (D.C.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995) (quoting *Meritor,* 477 U.S. at 73, 106 S.Ct. at 2408–09); *Bouton v. BMW of North America, Inc.,* 29 F.3d 103, 110 (3d Cir.1994) ("[W]e hold that an effective grievance procedure . . . shields the employer from Title VII liability for a hostile environment."); *Kauffman v. Allied Signal,*

*Inc.,* 970 F.2d 178, 184 (6th Cir.), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992) (stating that a grievance "policy itself, if effective, could serve as an insulation from liability"); *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1560 (11th Cir.1987) ("[A]n employer may be insulated from liability for hostile working environment sexual harassment where (1) the employer has an explicit policy against sexual harassment, and (2) it has effective grievance procedures . . . ."); *Ellerth v. Burlington Industries, Inc.,* 912 F.Supp. 1101, 1118 (N.D.Ill.1996) (refusing to hold an employer liable because of the plaintiff's "deliberate failure to utilize the equal employment opportunity procedures outlined in the handbook, and her failure to take any other measures to notify appropriate . . . management personnel about her harassment. . . .").

FCA has presented abundant evidence that its grievance procedures were "calculated to encourage victims of harassment to come forward"—the effectiveness standard set forth in *Meritor* and *Gary.* As discussed in the *Factual Background* section *supra,* FCA's Human Resources Department has manifested its willingness to take action to prevent sexual harassment by disciplining 17 employees since 1989 and investigating six other claims. The exhibits submitted by FCA show that it was not only willing to respond to harassment complaints,

er may be held "strictly liable"—that is, held liable without resort to agency principles. *See, e.g., Saxton v. AT & T Co.,* 10 F.3d 526, 536 n. 19 (7th Cir.1993) ("[I]f someone in the employer's decision-making hierarchy engages in harassment, the employer will be held liable regardless of whether it could reasonably have foreseen or prevented the misconduct. . . ."); *Volk v. Coler,* 845 F.2d 1422, 1436 (7th Cir.1988) ("DCFS is strictly liable for sexual harassment by supervisory personnel. . . ."); *Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1422 (7th Cir.1986). But other Seventh Circuit cases suggest otherwise. *See, e.g., Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 445 (7th Cir.1994) ("Whether sexual harassment by a supervisor can be imputed to the employer corporation is governed by the principles of agency."); *North v. Madison Area Association for Retarded Citizens,* 844 F.2d 401, 407 (7th Cir.1988) ("[I]t is clear in light of the decision in [*Meritor*] . . . that employers are no longer to be held to . . . a strict standard in every case in which the actions of a supervisory employee are in question."). The most recent Seventh Circuit pronouncement on this subject

states that employer strict liability for harassment by supervisors could "perhaps" be appropriate, but concludes that "[n]either the Supreme Court nor our court has had occasion to decide the question." *Baskerville v. Culligan International Co.,* 50 F.3d 428, 431–32 (7th Cir.1995).

We think that *Doe* and *North* most accurately state the law of the Seventh Circuit. To conclude otherwise would be to ignore the Supreme Court's holding in *Meritor* that "the Court of Appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisors." *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408. The above-quoted dicta from *Saxton* indicates that the Seventh Circuit may decide to impose strict liability on employers for the acts of those supervisors who are in the "decision-making hierarchy," but not for the acts of other supervisors. Although this distinction would prevent direct conflict with *Meritor,* it is in tension with *Meritor's* general conclusion that "Congress wanted courts to look to agency principles for guidance in this area." *Id.*

but also engaged in proactive efforts to raise employee awareness of and sensitivity to the problem (such as sponsoring role-playing sessions, showing informational videos, and circulating reminder pamphlets). Def.'s Exs. H–J. There is also undisputed evidence that Butta–Brinkman was aware of FCA's grievance procedures, and that she had enough confidence in the effectiveness of the procedures that she intended (at least at one point) to invoke them. Instead of doing so, however, she elected to file the instant lawsuit and not cooperate with FCA's subsequent attempts to investigate her claim.

Butta–Brinkman does not dispute FCA's evidence of effectiveness. Her only attempt to excuse her failure to invoke FCA's grievance procedures is to suggest that several employees—including Wagaman—told her that invoking the procedures would be fruitless. *See, e.g.,* Pl.'s 12(N) ¶¶ 9, 25, 80. But she has not presented any concrete evidence that might justify her co-workers' alleged lack of faith in FCA's grievance procedure.[6] These subjective assertions concerning FCA's grievance process are clearly insufficient to counter FCA's voluminous proof of its effectiveness,[7] and reliance on such assertions—which Butta–Brinkman never attempted to verify (Pl.'s Dep. at 81)—does not excuse her failure to lodge a grievance. Accordingly, there is no genuine question of

material fact with respect to FCA's liability with respect to any hostile work environment that may have existed, and we grant summary judgment for FCA on this issue.

### B. Quid Pro Quo

To prevail on her claim of *quid pro quo* harassment, Butta–Brinkman must eventually prove that: (1) Wagaman "made submission to sexual demands a condition of tangible employment benefits," *Dockter v. Rudolf Wolff Futures, Inc.,* 913 F.2d 456, 461 (7th Cir.1990); and (2) she experienced some tangible detriment as a result of her refusal to comply with Wagaman's demands, *id.; Gary v. Long,* 59 F.3d 1391, 1395–96 (D.C.Cir.1995) (collecting cases); *Rushing v. United Airlines,* 919 F.Supp. 1101, 1109 (N.D.Ill.1996)). Employers are strictly liable for acts of *quid pro quo* sexual harassment by their supervisory employees. *Horn v. Duke Homes,* 755 F.2d 599, 605–06 & n. 9 (7th Cir.1985); *see also Nichols v. Frank,* 42 F.3d 503, 513–14 (9th Cir.1994); *Karibian v. Columbia University,* 14 F.3d 773, 777 (2d Cir.), *cert. denied,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 185–86 (6th Cir.), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992); 3 Lex K. Larson, Employment Discrimination § 46.07[3] (2d ed. 1996).[8]

6. The comments which Brinkman uses to demonstrate her co-workers' lack of confidence in the grievance process concern the departure from FCA of a woman named Cheryl Valentine, who allegedly left because of Wagaman's harassment. Deposition testimony from Valentine, however, indicates that whatever the circumstances of her departure may have been, inadequate support from FCA's Department of Human Resources was not the problem. In fact, Valentine describes Caren Hosansky as "an advocate for women," and expresses confidence she would respond sympathetically to any complaint presented to her. Valentine Dep. at 127–29.

7. Since Brinkman does not present us with affidavits from the co-workers who allegedly lack faith in FCA's grievance process, their statements, as related by Brinkman, are hearsay. Thus, even if their statements were highly probative of ineffectiveness (which they are not), they could not be used as "evidence" to create a genuine issue of material fact. *See Friedel v. City of Madison,* 832 F.2d 965, 970–71 (7th Cir.1987).

8. The courts' rationale for holding employers strictly liable for *quid pro quo* harassment is succinctly stated in *Horn:* "The 'company' is a legal form; it can 'act' only through its duly appointed agents. Where, as here, the supervisory employee is given 'absolute' authority to hire and fire ... and uses this authority to extort sexual favors from employees, the supervisor *is,* for all intents and purposes, the company." *Horn,* 755 F.2d at 605. In contrast, the courts seem to believe that in hostile work environment cases it is less clear that the harasser acted pursuant to the actual or apparent authority delegated by the employer, and thus consideration of traditional agency principles is necessary. *See supra* section III.A; Frederick J. Lewis & Thomas L. Henderson, *Employer Liability for "Hostile Work Environment" Sexual Harassment Created by Supervisors: The Search for an Appropriate Standard,* 25 U.Mem.L.Rev. 667, 669 & n. 4 (1995).

Under this standard, Butta–Brinkman has clearly set forth evidence sufficient to create a question as to whether she was the victim of *quid pro quo* harassment. As discussed above, Butta–Brinkman's deposition testimony—which we believe for purposes of this motion—contains numerous examples of statements by Wagaman which "made submission to sexual demands a condition of tangible employment benefits." *See* Pl.'s Ex. B (chart listing Wagaman's various harassing statements). Butta–Brinkman also presents facts from which a jury might reasonably conclude that her refusal to comply with Wagaman's sexual demands resulted in tangible detriment to her, such as being placed on "probation" and a "performance plan," impairment of her ability to earn a bonus, and being forced to take a leave of absence because of stress-related illnesses caused by the harassment. Pl.'s 12(N) ¶¶ 84–89; Pl.'s Exs. D–E, M. These occurrences easily meet the low threshold plaintiffs must satisfy in showing a tangible detriment in *quid pro quo* cases. *See Bryson v. Chicago State University*, 96 F.3d 912, 915–16 (7th Cir.1996) (noting that "a wide variety of actions, some blatant and some subtle, can qualify" as tangible employment detriment); *see also Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir.1996) ("[A]dverse employment actions extend beyond readily quantifiable losses...."); *Collins v. Illinois*, 830 F.2d 692, 703 (7th Cir.1987); 3 Larson, *supra*, § 46.05[2] ("The plaintiff's job need not be at stake; less extreme adverse employment actions such as a ... disciplinary measure will suffice."). In its Reply Brief, FCA refers us to considerable evidence indi-

cating that Butta–Brinkman suffered no detriment, or that any detriment she experienced was unrelated to her refusal to comply with Wagaman's sexual demands, but we believe Brinkman has presented enough evidence on this question to create a genuine issue of material fact for the jury to resolve. Accordingly, we deny FCA's motion for summary judgment with respect to Butta–Brinkman's *quid pro quo* claim.[9]

## IV. Conclusion

For the foregoing reasons, FCA's motion for summary judgment is granted with respect to Butta–Brinkman's hostile work environment claims, and denied with respect to her *quid pro quo* harassment claims. It is so ordered.

9. We note that no federal court has allowed an effective grievance procedure to insulate an employer from a *quid pro quo* harassment claim. All of the cases cited in Part III.A expressly limit the effective grievance procedure analysis to hostile work environment claims, but we can find only one case that affirmatively asserts that grievance procedures are irrelevant in *quid pro quo* cases. *Codrington v. Virgin Islands Port Authority*, 911 F.Supp. 907, 912 n. 3 (D.V.I.1996). Presumably the reason for this limitation is that the defense is derived from agency principles, which are applicable only in hostile work environment cases.

Limiting the impact of an employer's effective grievance procedure in this manner may be doctrinally sound, but it makes for strange policy. It

is not obvious to us why we should require victims of harassment to utilize their employers' internal grievance procedures (assuming they are effective) when they complain of one type of harassment but not when they complain of another. The desirability of giving employers an opportunity to resolve harassment disputes without litigation seems equally compelling regardless of the type of harassment involved. *Cf.* 3 Larson, *supra*, § 46.07[5][c] ("[An] employee's obligation to notify the employer should not hinge on whether the harassment was *quid pro quo* or hostile environment, but whether the plaintiff's injury could be avoided or quickly remedied by resort to the employer's grievance channels.").