Jimmie M. PONDER, Plaintiff,

v.

**ROCHESTER GENERAL HOSPITAL,**
**Defendant.**

No. 98–CV–6070.

United States District Court,
W.D. New York.

Nov. 13, 1998.

Jimmie M. Ponder, pro se.

Daniel J. Moore, Rochester, NY, for Defendant.

## DECISION and ORDER

SIRAGUSA, District Judge.

### Introduction

This is a civil rights action, brought pursuant to Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et. seq.*, in which plaintiff, representing himself, alleges a hostile work environment claim[1] against his former employer. The case is before the Court on defendant's motion for summary judgment [14] filed on October 29, 1998. The motion was filed pursuant to this Court's scheduling order [8] of July 7, 1998, which set a return date of November 6, 1998 for any dispositive motions filed by defendant and set oral argument for November 12, 1998. To date, plaintiff has not filed any papers in response to the motion; thus, the Court considers only defendant's moving and supporting papers, [and] the Complaint [and plaintiff's oral argument] in deciding the motion. For the reasons stated below, defendant's motion is granted.

### Facts

Plaintiff, a black African–American male, was employed by Rochester General Hospital as a Licensed Practical Nurse II in March of 1995. Defendant's Statement of Facts Not in Dispute [16], at 2. He was assigned to the 5100 Acute Care Telemetry Unit. Affidavit of Cynthia Fields [14] (hereinafter Fields Affidavit), at 1. Cynthia Fields was the Director of Nursing for two acute care telemetry units in the hospital, 5100 and 4800. Both units were staffed by approximately 16 nurses working on three shifts. Fields Affidavit, at 1. Cynthia Fields, a white female, was plaintiff's immediate supervisor. *Id.*; plaintiff's N.Y. Div. of Human Rights Complaint (April 25, 1996) (hereinafter N.Y. Complaint) (attached to Plaintiff's federal Complaint [1] ), at paras. 1–2.

It was the hospital's policy that all nurses and licensed practical nurses working in telemetry units receive a passing grade on an open book telemetry examination[2] administered annually by the hospital. Fields Affidavit, at 1–2. If a nurse fails the examination, he is given one additional opportunity to pass the examination, usually within two weeks of the failed examination. Fields Affidavit, at 2. After a second failure, a nurse is not permitted to work in a telemetry unit and must transfer to a nontelemetry unit if an opening is available. *Id.* Plaintiff took the open book telemetry examination in August of 1995 after completing his telemetry class. Fields Affidavit, at 2. He failed that examination and retook it in September and passed. *Id.*

Nurses are reviewed annually and plaintiff's first review was in October 1995. Fields Affidavit, at 2. His evaluation showed that he was meeting expectations and was later annotated by Cynthia Fields to indicate that he had passed his telemetry examination. *Id.*; Performance Appraisal (Oct. 20, 1995), attached as Exhibit 2 to defendant's Statement of Facts Not in Dispute [16].

Plaintiff was required to take the telemetry examination again in 1996 with all the other nurses in the 4800 and 5100 units in January or February. However, Plaintiff was out on disability from January 15 through March 11, 1996 and did not take the open book telemetry examination until he returned. Fields Affidavit, at 3. He failed that examination. He was also absent from work on March 17 and April 15, 1996, which Ms. Fields stated caused problems for the unit. *Id.*

Plaintiff alleges in his complaint that he first approached his supervisor in November of 1995 with a generalized complaint that certain nurses were "giving [him] a hard time and would not help [him]." Plaintiff's N.Y. Div. of Human Rights Complaint (April 25, 1996) (hereinafter N.Y. Complaint) (attached to plaintiff's federal Complaint [1] ), at paras. 1–2. It was not until April of 1996 that plaintiff approached Ms. Fields with complaints of racial comments. N.Y. Complaint,

---

**1.** In his form Complaint, Plaintiff checked several different causes of action; however, the facts he stated in the complaint support only the hostile working environment claim.

**2.** Plaintiff described this test as a measure of a nurse's ability to read the heart monitor and heart rhythms. Ponder Deposition, at 59 (attached as Exhibit 1 to Defendant's Statement of Facts Not in Dispute).

at para. 4; Fields Affidavit, 3. On April 19, 1996, plaintiff's supervisor called him into her office to speak with him about his absences from work. Fields Affidavit, at 3. Plaintiff complained to her that he "could not stand coming to work," that he was made to "feel stupid," was not given support by co-employees and was subjected to racial comments. *Id.* Ms. Fields stated this was the first time she had heard any allegations of racially offensive comments and was "very concerned." Fields Affidavit, at 3. She tried to obtain further details from plaintiff, but he refused. *Id.,* at 3–4. She explained defendant's policy against discrimination and the grievance procedure and stated that at a minimum he should let the persons making offensive comments know that they were offensive. She asked him to let her know if any other comments were made and promised to intervene immediately and repeated that she would act on his present complaints if plaintiff desired. Fields Affidavit, at 4. Plaintiff "directly told [her] that he did not wish to pursue it." *Id.;* Interview Record (Apr. 29, 1996), at 1 (attached as Exhibit 4 to defendant's Statement of Facts Not in Dispute). Ms. Fields also addressed plaintiff's concerns about not receiving support from his co-employees. *Id.*

Plaintiff did not reveal the details of the racial harassment to his supervisor, but did include details in his N.Y. Complaint, at 1. Specifically he alleged that in December of 1995 he was asked if he was, "waiting to get home to eat some of that chicken and watermelon that you know you love." Plaintiff writes in his N.Y. Complaint, at paragraph 3, that in January of 1996, another nurse pulled back plaintiff's ears and remarked, "Doesn't he look like a monkey?" Plaintiff mentions a total of six specific incidents in his N.Y. Complaint of racially discriminatory remarks. He claimed that he reported the incidents to his Nurse Manager in November of 1995 and in April of 1996, but that he was not satisfied with her responses. Plaintiff's deposition and N.Y. Complaint, however, indicates that the first time he gave Ms. Fields details about the racial comments was in April of 1996. Ponder Deposition, at 57 (attached as exhibit 1 to defendant's Statement of Facts Not in Dispute). However, he could not

state that he provided Ms. Fields with the names of the persons making the offensive comments. *Id.* ("I can't say, you know, what I specifically told her.")

At the end of her April 16, 1996 interview of plaintiff, Ms. Fields asked him to (a) retake the telemetry test within two weeks in accordance with the hospital's policy, (b) immediately advise her if any further "uncomfortable situations" developed and she would set up a "one-on-one interview with anyone making offensive comments based upon race and take disciplinary action if necessary," and (c) participate with her in a "unit level problem solving meeting to address his concerns regarding support." Fields Affidavit, at 4; Interview Record (Apr. 16, 1998), at 2 (Exhibit 4 of defendant's Statement of Facts Not in Dispute).

Following the April 16, 1996 meeting, Ms. Fields undertook to investigate further and interviewed the only other black African–American male nurse in the 5100 unit, La-Mont Raynor, who was also a licensed practical nurse. Fields Affidavit, at 5. Mr. Raynor told her, "that he had never heard any offensive or racial comments, nor did he believe the environment in the 5100 unit was hostile in any manner. In fact, his perception was quite to the contrary." Fields Affidavit, at 5.

On May 17, 1996 plaintiff submitted his resignation, effective May 31, 1996. Fields Affidavit, at 5; plaintiff's Resignation Letter (May 17, 1996) (Exhibit 7 of defendant's Statement of Facts Not in Dispute). Ms. Fields set up a meeting with her supervisor, Easter Tucker, Assistant Vice President of Nursing, and plaintiff. Fields Affidavit, at 5. Plaintiff repeated his complaints about a stressful and hostile working environment, but stated he was not interested in pursuing any complaint following his and Fields' April 16, 1996 discussion, "because he 'would just be pacified'." Fields Affidavit, at 5; Interview Record (May 17, 1996), attached as Exhibit 8 to defendant's Statement of Facts Not in Dispute. Ms. Fields offered to transfer plaintiff to the 4800 unit and conduct a more thorough investigation of the 5100 unit, but plaintiff refused. She also invited him to

participate in a Code of Conduct Committee to resolve the issues he raised, but he refused that accommodation as well. Fields Affidavit, at 6. Plaintiff was still unwilling to discuss the incidents in detail or name the nurses who had made the offensive comments. *Id.*

The following day, plaintiff accepted the transfer to the 4800 unit and agreed to remain there until his last work day. On May 20, 1996, Ms. Fields sent plaintiff a memorandum again inviting him to participate in the grievance resolution procedure. Fields Affidavit, at 6; Fields Memorandum (May 20, 1996), attached as Exhibit 9 to defendant's Statement of Facts Not in Dispute. In the memorandum, Ms. Fields stated that she would interview the "5100 staff members outlined in your complaint" and invited him to participate. She invited him to participate in the unit based Code of Conduct Committee regarding his April complaint of lack of teamwork. She also offered to permanently transfer him to the 4800 telemetry unit if he so desired. *Id.*

Plaintiff worked in the 4800 telemetry unit beyond his original resignation date and asked Ms. Tucker if he could continue to work in that unit. Fields Affidavit, at 6–7. He was told he needed to pass the telemetry examination. *Id.* He refused to take the examination and "his employment was terminated pursuant to his request on June 6, 1996." Fields Affidavit, at 7.

When in his N.Y. State Division of Human Rights Complaint plaintiff finally identified the nurses who made offensive comments, those nurses were questioned and "the nurses identified indicated that they either did not make the comments alleged, or their comments were taken out of context, misinterpreted, or in one case, initiated by Mr. Ponder." Fields Affidavit, at 7–8.

### Discussion

The law on summary judgment is well settled. Summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3rd Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the "evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

Once the moving party has met its initial obligation, the opposing party must produce evidentiary proof in admissible form sufficient to raise a material question of fact to defeat a motion for summary judgment, or in the alternative, demonstrate an acceptable excuse for its failure to meet this requirement. *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187 (5th Cir.1991); Fed.R.Civ.P. 56(f). Once the moving party has met its burden, mere conclusions or unsubstantiated allegations or assertions on the part of the opposing party are insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir.1986).

Before evaluating each complaint, a review of the controlling law is in order. To sustain his burden of proof under Title VII, plaintiff must show by a preponderance of the evidence that the

> *employer's* conduct " 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.' " *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. at 65, 106 S.Ct. at 2404 (quoting 29 C.F.R. § 1604.11(a)(3) (1985)). A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.' " *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 19, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor*, 477 U.S. at 65, 67, 106 S.Ct. at 2404, 2405) (some internal brackets and

quotation marks omitted); *Karibian v. Columbia University*, 14 F.3d 773, 779 (2d Cir.), *cert. denied*, 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994). Whether a workplace should be viewed as hostile or abusive—from both a reasonable person's standpoint as well as the victim's subjective perception—can only be determined by considering the totality of the circumstances. *Harris*, 510 U.S. at 22, 114 S.Ct. at 371.

*Tomka v. Seiler Corporation*, 66 F.3d 1295, 1305 (2d Cir.1995) (emphasis added).

Plaintiff has failed to bring forth sufficient facts to attribute any liability to defendant hospital from the alleged acts of plaintiff's fellow non-supervisory nurses. However, even if he had raised a *prima facie* case of racial discrimination, the Court would find that defendant has shown there is no basis for holding defendant liable under a theory of vicarious liability. No allegations exist that any person in a supervisory or managerial position with defendant created, caused others to create or participated in creating a hostile working atmosphere, or directly racially discriminated against plaintiff. To the contrary, the evidence is conclusive that defendant did everything possible to immediately investigate and resolve plaintiff's complaints; however, plaintiff failed to provide sufficient information or cooperate with the reasonable measures advanced by defendant's Nurse Manager, his supervisor, or the Assistant Vice President in charge of Nursing. Plaintiff has also not shown that defendant's offer to transfer him to the 4800 unit pending investigation, or permanently, was detrimental. Moreover, the evidence is clear that plaintiff was discharged due to his failure to qualify for the position by refusing to retake the required open book telemetry examination.

The Court therefore finds that defendants have met their burden of proof and it is hereby,

ORDERED that defendants' motion for summary judgment [14] is granted and the case is dismissed.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Decision and Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is hereby denied. *Coppedge v. United States*, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.